PEOPLE v DYE

Docket No. 77166. Argued April 8, 1987 (Calendar No. 11). Decided
    August 2, 1988. Certiorari denied by the Supreme Court of the
    United States on December 5, 1988, 488 US —.

    Paul A. Dye was convicted on retrial by a jury in the Detroit
    Recorder's Court, Michael F. Sapala, J., of two counts of first-
    degree murder and two counts of possession of a firearm during
    the commission of a felony after a mistrial had been declared
    in his first trial. During the first trial, evidence that the
    defendant had committed the killings was provided by the
    testimony of three fellow members of a motorcycle club. During
    the second trial the witnesses were declared unavailable, and
    the court permitted their testimony at the first trial to be read
    to the jury after finding due diligence on the part of the
    prosecution to locate and produce the witnesses. The Court of
    Appeals, Bronson, P.J., and J. H. Gillis and Allen, JJ., af-
    firmed in an unpublished opinion per curiam (Docket No.
    74931). The defendant appeals.

        In opinions by Justice Levin, joined by Justices Cavanagh
    and Archer, and by Justice Brickley, the Supreme Court held:

        The prosecutor did not exercise due diligence in attempting
    to produce the three witnesses at the defendant's retrial, re-
    quiring reversal and remand for a new trial.

        And in opinions by Justice Boyle, joined by Chief Justice
    Riley and Justice Griffin, and by Justice Brickley, the Su-
    preme Court further held:

        The evidentiary errors alleged by the defendant did not
    result in a miscarriage of justice.

        Justice Levin, joined by Justice Cavanagh, stated that the
    prosecution did not exercise due diligence in attempting to
    produce the three witnesses at the defendant's retrial, requir-
    ing reversal and remand for a new trial. In addition, because it
    would not have been natural for the defendant to have made
    an incriminating statement to the police prior to his arrest, or
    to have accused anyone else of the killings in the presence of
    the police or a fellow club member, questions regarding the
    defendant's statements or silence should not be asked on retrial
    during the prosecution's case in chief.

        1. In all criminal proceedings, an accused has the right to

confront witnesses. The confrontation is important because it enables the trier of fact to judge the witnesses' demeanors. However, where a witness is not present at trial, the witness' testimony bears satisfactory indicia of reliability, and the prosecutor establishes that a diligent, good-faith effort to obtain the witness' presence at trial was made, a transcript of prior testimony may be offered in evidence. In this case, the record indicates that the prosecutor failed to make a diligent, good-faith effort to produce the witnesses in question at the defendant's retrial, and that any attempts at cure were tardy and incomplete.

2. Questioning by the prosecution in its case in chief of the three witnesses who, with the defendant, cleaned up the clubhouse after the killings and disposed of the victims' bodies, regarding whether he had made a statement to the police was improper. Because the defendant claimed he was an accomplice after the fact, any statement would have incriminated him, and it would not have been natural for the defendant to have made such a statement. However, the questioning of the three witnesses with regard to whether the defendant had accused anyone else of the killings was not improper, but was merely a restatement in different form of the witnesses' properly admitted testimony regarding the defendant's alleged confession. By contrast, questions by the prosecution of a witness not involved in the cleanup or disposal regarding whether the defendant had accused anyone else of the killings were improper because such an accusation would have incriminated the defendant. On remand, the questions should not be permitted.

Justice ARCHER, concurring, stated that the prosecution failed to exercise due diligence in attempting to produce the principal res gestae witnesses, and the trial court abused its discretion in finding due diligence and in allowing use of the witnesses' testimony from the previous trial, requiring reversal and remand for a new trial.

Use of prior recorded testimony in place of live testimony of endorsed res gestae witnesses is subject to the defendant's fundamental right to confront witnesses under the Michigan and United States Constitutions. Before such testimony is admitted, the prosecution must show due diligence under the circumstances in its effort to produce the witnesses.

In this case, the defendant's right to a fair trial was greatly hampered, violating his right of due process. The first mistrial resulted from the jury's inability to give credence to the testimony of the witnesses. The inability of the jury at the second trial to view the demeanor of the res gestae witnesses greatly

reduced the validity and reliability of its evaluation of the witnesses' credibility. The efforts of the police and the prosecutor to locate the witnesses fell short of due diligence, and the prosecutor's delay in informing defense counsel of the absence of the witnesses resulted in unfair surprise.

Justice BRICKLEY concurred with Justice LEVIN on the issue of due diligence and the result required by its resolution, and with Justice BOYLE on the allegations of evidentiary errors.

Justice BOYLE, joined by Chief Justice RILEY and Justice GRIFFIN, stated that on the basis of the facts of the case, the trial court did not abuse its discretion in finding due diligence on the part of the prosecution in attempting to locate the missing witnesses. The evidentiary errors alleged by the defendant did not result in a miscarriage of justice.

1. Testimony taken at an examination, a preliminary hearing, or a former trial of a case, or taken by deposition at the insistence of a defendant, may be used by the prosecution whenever the witness giving such testimony cannot be produced at the trial or has become insane or otherwise mentally incapacitated. Before the testimony may be admitted, the prosecutor must exercise due diligence in attempting to produce the witness. The determination of due diligence is a matter for the trial court, and the determination will not be overturned on appeal unless a clear abuse of discretion is shown. The test is whether the proponent of the evidence made good-faith efforts to procure the testimony, not whether more stringent efforts would have produced it. On the facts of this case, it cannot be said that the trial court abused its discretion.

2. Whether prearrest silence is to be admitted for purposes of impeachment is an evidentiary question to be resolved by reference to its relevancy and in light of its probativeness as opposed to its potential for prejudice. In this case, questioning regarding the defendant's postarrest silence was initiated by defense counsel on direct examination of the defendant, permitting questioning by the prosecutor during cross-examination regarding postarrest conduct inconsistent with the defendant's postarrest statement. The impeaching inquiry did not concern the defendant's silence, but his postarrest statement. The prosecutor did not allude to the defendant's postarrest conduct in his case in chief, but rather to the defendant's prearrest conduct. The inquiries of witnesses regarding whether the defendant had said anything inconsistent with his admission of guilt cannot be considered to be comment on prearrest silence or irrelevant. Assuming, arguendo, that questions regarding the defendant's failure to deny guilt, put to witnesses to whom the

defendant did not admit guilt, were error, the defendant offered no timely objection, and, on the basis of the record, it cannot be concluded that admission of the testimony would result in a miscarriage of justice.

Reversed and remanded.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief, Criminal Division, Research, Training and Appeals, and *Andrea L. Solak,* Principal Attorney, Appeals, for the people.

State Appellate Defender (by *Mardi Crawford*) for the defendant.

Levin, J. Paul Dye was convicted on retrial of two counts of first-degree murder[1] and two counts of possession of a firearm during commission of a felony.[2] Dye's first trial was declared a mistrial, with the jury voting eleven to one to acquit him on the first-degree murder charges.[3] At the first trial the testimony of three witnesses—fellow members of a motorcycle club—provided the only evidence that Dye was the killer. At Dye's retrial the prosecution did not produce these three witnesses. The trial court allowed assistant prosecutors to read the witnesses' earlier testimony to the jury.

This appeal presents two questions. The first is whether the prosecution showed due diligence in attempting to produce the three witnesses for the second trial. The three witnesses were in protective custody immediately preceding and until they completed their testimony at the first trial, and were then released. Subsequent efforts to locate

[1] MCL 750.316; MSA 28.548.

[2] MCL 750.227b; MSA 28.424(2).

[3] In the retrial, the jury twice asked the trial judge to declare a hung jury. Each time the judge told the jury to continue their deliberations.

the witnesses for the second trial were tardy and incomplete. We reverse and remand for a new trial.

The second question concerns evidentiary issues. The prosecution in its case in chief elicited testimony from the three witnesses and Richard Troher that Dye had not accused anyone else of committing the killings and had failed to make a statement to the police. On retrial the prosecution may not in its case in chief ask Troher whether Dye accused another of the killings, or inquire on direct examination whether Dye made a statement to the police.

I

Early in the morning of August 29, 1982, two women were killed in the clubhouse of the Forbidden Wheels Motorcycle Club. They had each been shot through the head. Their bodies were dumped on the curb of a residential street and discovered there by early morning commuters.

Four club members were in the clubhouse at the time of the murders. Dye, Bruce Seidel, James Dawson, and Steve Stever all admitted to helping clean up the clubhouse after the killings. Seidel, the prosecution's chief witness, accused Dye of killing the women. Dye accused Seidel of being the killer.[4] Dawson and Stever, who had been in an

---

[4] Dye and Seidel spent the evening together in a bar and then came to the clubhouse. Shortly after they arrived, the two victims rang the doorbell and were admitted. Dye, Seidel, and the two women drank and played pool for some time. Neither Dye nor Seidel had previously known either woman.

According to Seidel, after some time Dye began betting one of the victims that before the night was over she would perform oral sex upon him. At this point, Dye and Seidel were on the service side of the club's bar, and the two women were seated on the customers' side. Seidel said that when this "betting" began, he withdrew from the conversation and went to the other end of the bar. According to

upstairs apartment apparently asleep at the time
of the killings, testified that Seidel walked up-
stairs, awakened them, and told them that Dye
had just killed two women. Seidel, Dawson, and
Stever further testified that after Seidel and Dye
dumped the bodies, all four met in Stever's garage,
where Dye admitted to the killings.[5]

Seidel, Dawson, and Stever testified under a
limited grant of immunity.[6] All three left the state
after the killings, and returned to Michigan to
testify at the first trial. Upon their return they
were kept in protective custody until after they
completed their testimony to prevent other "bik-
ers" from harming them. The prosecution failed to
produce any of the three to testify at the second
trial.

Seidel the "betting" talk became increasingly heated, with Dye finally
exclaiming that she would perform oral sex. According to Seidel, Dye
then pulled a revolver from the waistband at the small of his back,
racked a shell into the chamber, placed the muzzle against her
forehead, and pulled the trigger. According to Seidel, the back of her
head exploded and she fell off the barstool and onto the floor. Seidel
said that he then turned away. He said that he heard the second
victim say that she did not believe what was happening, heard Dye
say "I do," and then heard a second shot. When he turned back the
second victim lay dead on the floor.

According to Dye, Seidel was serving the women drinks and Dye
was observing when Dawson and Stever burst in out of breath and
exclaimed that they had just firebombed the house of the mother of a
former president of the Forbidden Wheels Club. (The house had in
fact been firebombed and a police dog tracked a scent to within 100
feet of the clubhouse.) Dawson and Stever approached Dye, Seidel,
and the two women and began relating their story. Seidel objected,
indicating that they should not discuss this in front of the two
women. Dawson and Stever then went upstairs to "watch the smoke"
and see if they could see some flames. Dye then decided to go home.
He called his wife, who after learning that Dye had been drinking
told him to stay at the club. (Dye's wife corroborated receipt of the
phone call and the substance of the conversation.) Dye then lay down
on a couch and asked Seidel to wake him at about 6:00 A.M. Dye was
awakened by a loud noise, and then heard another loud noise and a
thump. Dye then stood, approached the bar, and saw Seidel standing
over the two bodies.

[5] Dye denied confessing.

[6] Their own testimony could not be used in any prosecution against
them.

## II

### A

The Sixth Amendment of the United States Constitution, and art 1, § 20 of the Michigan Constitution of 1963, provide in part that in all criminal prosecutions the accused shall "be confronted with the witnesses against him . . . ."[7] The United States Supreme Court has emphasized that the purpose of the Confrontation Clause is to provide for a face-to-face confrontation between a defendant and his accusers at trial.[8] This confrontation is an important right of the defendant because it enables the trier of fact to judge the witnesses' demeanors. The Court in *Ohio v Roberts,* 448 US 56, 63-64; 100 S Ct 2531; 65 L Ed 2d 597 (1980), declared:

> [T]he Clause envisions "a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."[9]

Demeanor evidence is important. As the Third

[7] The Sixth Amendment applies to the states through the Fourteenth Amendment. *Pointer v Texas,* 380 US 400; 85 S Ct 1065; 13 L Ed 2d 923 (1965).

[8] See, e.g., *Ohio v Roberts,* 448 US 56; 100 S Ct 2531; 65 L Ed 2d 597 (1980); *Mattox v United States,* 156 US 237; 15 S Ct 337; 39 L Ed 409 (1895).

[9] Quoting *Mattox v United States,* n 8 *supra,* pp 242-243. See also *Pointer v Texas,* n 7 *supra,* p 405. ("There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.")

Circuit Court of Appeals noted in *Virgin Islands v Aquino,* 378 F2d 540, 548 (CA 3, 1967):

> Demeanor is of the utmost importance in the determination of the credibility of a witness. The innumerable telltale indications which fall from a witness during the course of his examination are often much more of an indication to judge or jury of his credibility and the reliability of his evidence than is the literal meaning of his words. Even beyond the precise words themselves lies the unexpressed indication of his alignment with one side or the other in the trial. It is indeed rarely that a cross-examiner succeeds in compelling a witness to retract testimony which is harmful to his client, but it is not infrequently that he leads a hostile witness to reveal by his demeanor—his tone of voice, the evidence of fear which grips him at the height of cross-examination, or even his defiance— that his evidence is not to be accepted as true, either because of partiality or overzealousness or inaccuracy, as well as outright untruthfulness. The demeanor of a witness, as Judge Frank said, is "wordless language." *Broadcast Music, Inc v Havana Madrid Restaurant Corp,* 175 F2d 77, 80 (CA 2, 1949).

A transcript of prior testimony may nevertheless be offered in evidence upon a showing that the witness is unavailable and that the testimony bears satisfactory indicia of reliability.[10]

---

[10] See *Ohio v Roberts,* n 8 *supra; People v Schepps,* 217 Mich 406; 186 NW 508 (1922). MCL 768.26; MSA 28.1049 provides:

> Testimony taken at an examination, preliminary hearing, or at a former trial of the case, or taken by deposition at the instance of the defendant, may be used by the prosecution whenever the witness giving such testimony can not, for any reason, be produced at the trial, or whenever the witness has, since giving such testimony become insane or otherwise mentally incapacitated to testify.

This Court noted in *People v McIntosh,* 389 Mich 82, 87; 204 NW2d

To establish the witness' unavailability, the proponent[11] must establish that he has made a diligent, good-faith effort to obtain the witness' presence at trial.[12] This is a substantial requirement. "[I]f there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation."[13]

In *Motes v United States*, 178 US 458; 20 S Ct 993; 44 L Ed 1150 (1900), the United States Supreme Court held that police negligence barred a finding of good-faith diligent effort. A codefendant in a murder prosecution had provided the primary evidence against the other defendants in testimony at a preliminary examination. Prior to trial he escaped due to the negligence of the police. At trial the judge admitted the preliminary examination testimony as substantive evidence against the remaining defendants. The United States Supreme Court reversed, stating:

> We are unwilling to hold it to be consistent with the constitutional requirement that an accused shall be confronted with the witnesses against him, to permit the deposition or statement of an absent witness (taken at an examining trial) to be read at the final trial when it does not appear that the witness was absent by the suggestion, connivance or procurement of the accused, but does

135 (1973), that the statute must be construed in a manner consistent with prevailing constitutional authority.

[11] The level of diligence required may vary depending upon the nature of the action and the proponent's identity. It has been said that the prosecutor is held to a higher standard as the proponent than is a criminal defendant or parties in a civil action. McCormick, Evidence (3d ed), § 253, pp 756-757.

[12] *Ohio v Roberts*, n 8 *supra*, p 60, quoting *Barber v Page*, 390 US 719, 724-725; 88 S Ct 1318; 20 L Ed 2d 255 (1968); *People v McIntosh*, n 10 *supra*, p 86. ("[T]he prosecution must show due diligence in their efforts to produce such [allegedly unavailable] witnesses.")

[13] *Ohio v Roberts*, n 8 *supra*, p 74 (emphasis in original).

appear that his absence was due to the negligence
of the prosecution. [178 US 474.]

**B**

Whether the prosecution made a diligent, good-
faith effort to produce missing witnesses is an
evaluation that depends on the particular facts of
each case. The record in the instant case indicates
that, in the circumstances of this case, the prose-
cution failed to make such a diligent, good-faith
effort to produce Seidel, Dawson, and Stever.

Seidel, Dawson, and Stever had been difficult to
locate for the first trial. The officer in charge,
Kuhnlein, testified that when the three were re-
leased, he knew that each was going out of state.
All three had an incentive to go into hiding. They
were in protective custody during the first trial to
prevent other "bikers" from harming them for
testifying against Dye. This threat remained after
their release. Additionally, the witnesses may have
feared prosecution; they had been given only lim-
ited immunity. All three were admitted accom-
plices after the fact in the murders. Stever and
Dawson were suspects in a related firebombing.[14]

The mistrial was declared on March 17, 1983.
On May 13, 1983, the court set Dye's retrial for
August 22, 1983. As of May 13, the witnesses had
been released for approximately two months. Dur-
ing this two-month period, the prosecution had
made no effort to relocate Seidel, Dawson,[15] or
Stever even though the prosecution knew that the
witnesses were needed, they had expressed an

[14] See n 4.

[15] The assistant prosecutor testified that during this period Dawson
repeatedly telephoned him to learn whether and when Dye would be
released on bond. All these contacts appear to have been initiated by
Dawson, not the prosecution.

intention to leave the state, and had incentives to go into hiding. And once the prosecution learned of the retrial date, its efforts to produce the witnesses were, in the circumstances of this case, tardy and incomplete. These efforts are detailed below.

1

An assistant prosecutor testified that during March, April, and early May of 1983, Dawson repeatedly telephoned to ask whether and when Dye was going to be released on bond. Because Dawson had testified against Dye, he may have feared Dye would seek revenge. Dye was released on June 17, 1983. The prosecution did not attempt to communicate with Dawson until four weeks after Dye's release. The prosecution telephoned Dawson on July 12 and learned that his telephone line had been disconnected. No investigation into Dawson's whereabouts, however, was conducted until August 5—three weeks later, and just seventeen days before the retrial date—when the prosecution attempted to serve a subpoena on Dawson at a Detroit address.

The woman answering the door reported that she had purchased the house from Dawson three weeks before and that she had no idea where he was. It does not appear that any effort was made to communicate with the lawyer, real estate agent, or bank involved in the house sale. Had the prosecution investigated immediately upon learning on July 12 that Dawson's phone had been disconnected, they would—according to the date given by the woman who purchased the house—have arrived at the house before the sale was completed

and while Dawson might have still been in the area.

Dawson's wife was a postal employee.[16] Through her employer the prosecution obtained a forwarding address in Cucamonga, California. On August 5, 1983—just seventeen days before Dye's retrial— the prosecution mailed to the California district attorney for Cucamonga a certificate under the uniform act to secure the attendance of witnesses from without a state in criminal proceedings,[17] requesting that the prosecutor serve and arrest Dawson. The assistant prosecutor did not communicate with the California district attorney again until August 16—less than a week before Dye's retrial—when he learned that the California district attorney had received the certificate but had not yet served Dawson. The record does not indicate that the California district attorney had even begun looking for Dawson. Also on August 16, the assistant prosecutor mailed a photograph of Dawson to the California district attorney. On August 18, four days before Dye's retrial, the California district attorney telephoned and said that while Dawson had apparently been living at the Cucamonga address, he was not there at the time the investigators visited. They thought that Dawson had a job lead in the area and said they were going to continue trying to locate him. There is no evidence of any further efforts by the California authorities or of further communication between the prosecution and the California district attorney after the August 18 phone call.[18]

It thus appears that although both Dawson and

---

[16] It does not appear that the prosecution made any efforts to communicate with the wife's relatives or friends.

[17] MCL 767.91 *et seq.;* MSA 28.1023(191) *et seq.*

[18] Officer Kuhnlein telephoned the jails, hospitals, and morgues in Oakland, Macomb, and Wayne counties. He also checked with the Department of Social Services. The record does not indicate when these inquiries were made.

his wife were living at an identified address in California, the only effort of record to locate him was a single visit by California investigators to that address. The record does not indicate on what day or at what time that visit occurred. There is no reason to conclude that further efforts to locate Dawson or his wife at that address would have been of no avail.

2

The prosecution did not attempt to communicate with Seidel, the sole eyewitness, until June 2— almost three months after Seidel's release and almost a month after the date for Dye's retrial had been set—when it sent a request for information to the police department of Mason City, Iowa, where Seidel had previously lived with his mother.

The Mason City police telephoned Seidel's mother and reported that, according to his mother, Seidel was working out of town and that when he returned his mother would give him the message to call the assistant prosecutor. This request was apparently repeated on June 22, and the assistant prosecutor apparently received the same response. On July 7, the prosecution telephoned Mrs. Seidel directly. She made the same response she had made to the Mason City police.

Although it had clearly been established by July 7 that Seidel was missing, there was no further communication with his mother or any visit to his mother's home until approximately six weeks later —about August 16, less than one week before Dye's retrial—when the prosecution apparently called the district attorney for Mason City and learned that he had received a certificate forwarded by the prosecution on August 5 under the

uniform act for Seidel.[19] Some time after receipt of the certificate members of the Mason City police visited the house, and it appears that they believed that Seidel was living there.

Also on August 16, the prosecution mailed a photograph of Seidel to the local district attorney. There is no evidence of any further communication between the prosecution and the local district attorney.

It does not appear that the Mason City police made more than one visit to the Seidel home. Seidel was the prosecution's most important witness. Yet the prosecution did not send an investigator to Mason City or ask the Mason City police to exert further efforts to locate him.

The prosecution did not suggest checking, nor did the local police—as to Seidel, Dawson, or Stever—check, locales frequented by bikers. Seidel was in fact arrested by Iowa police on another charge one week after Dye's retrial ended.

3

Stever apparently left the state several days after being released.[20] The prosecution did not attempt to locate Stever until August 1—four and a half months after the mistrial was declared and just three weeks before Dye's retrial was scheduled to begin—when Officer Kuhnlein attempted to serve Stever with a subpoena at a local home address. The man who answered the door was renting the house, said that he had not seen Stever for some time, and thought that he had gone either to Wisconsin, Tennessee, or California. The tenant was about to leave because he had learned that the house was to be repossessed.

[19] See n 17.
[20] According to Dawson's mother.

On August 5, seventeen days before Dye's re-
trial, the prosecution mailed to the Livingston,
Tennessee, district attorney a certificate under the
uniform act for Stever. Stever had traveled from
Livingston to Detroit to testify at the first trial,
but there was little or no reason to believe that he
had returned to Livingston. Dawson's mother told
Kuhnlein that Stever almost certainly had not
returned to Tennessee.

On August 16 the assistant prosecutor tele-
phoned the Livingston district attorney and
learned that he had received the certificate, but
had not yet served Stever. The record does not
indicate that the Livingston district attorney had
begun looking for Stever. There is no evidence of
any further communication between the prosecu-
tion and the local district attorney.

On August 22, during the afternoon session of
the due diligence hearing, Officer Kuhnlein testi-
fied that after his direct testimony that morning,
he telephoned Detroit Edison and learned that
Stever had been receiving electrical service at his
Michigan address under the name of "Donald"
Stever. There is no evidence that the prosecution
relayed this information to the Livingston district
attorney or followed up on it in any other way.

There is no evidence that the prosecution com-
municated with the repossessing bank to deter-
mine if it had any forwarding addresses or could
provide other leads to persons who may have
known Stever's whereabouts. The tenant said that
his previous month's rent was collected by a per-
son who he thought was a member of Stever's
family. There is no evidence of an effort to locate
this person.

The prosecution had not obtained the names or
addresses of any of Stever's relatives other than
the address of his mother. And, although it had

Stever's mother's address, it did not attempt to communicate with her. The prosecution had the name of Stever's girl friend—who had reportedly left with him—but there is no evidence of any attempt to communicate with her friends and relatives.

C

The Illinois Court of Appeals in *People v Payne,* 30 Ill App 3d 624; 332 NE2d 745 (1975), determined that the prosecution had failed to exercise good-faith diligence in attempting to locate a missing witness. Jerome Payne was tried for robbing Oscar Fallin. A mistrial was declared because the jury was unable to agree. On retrial, Payne was convicted. Fallin testified at the first trial, but did not appear at the retrial. The transcript of his previous testimony was read to the jury.[21]

The prosecution made numerous attempts to locate Fallin. The chief investigator noted that he made "20 to 25 attempts" to locate him before Payne's retrial. After detailing the prosecution's substantial efforts, the court declared that they were insufficient. Not only had the prosecution been tardy and incomplete in its efforts to find Fallin after the first trial, it had known that Fallin had been difficult to find for the first trial and yet had taken no measures to assure his return for the retrial. "The State was aware that Fallin had been a difficult witness to locate for the first trial, but took no steps to insure his appearance later even though it knew that his testimony was essential to a conviction and that the case would be tried again." *Payne, supra,* p 629. The prosecution's failure to take adequate measures to assure that a vital witness against the defendant

[21] The opinion does not indicate whether there were any other witnesses or other evidence implicating Payne.

would appear at a retrial barred a finding of good-faith due diligence.[22]

[22] This Court's most recent opinions on the prosecution's duty to produce witnesses at trial indicate that the prosecution's efforts in this case failed to rise to the level of good-faith due diligence. In *People v Pearson,* 404 Mich 698; 273 NW2d 856 (1979), this Court evaluated the prosecution's efforts to produce res gestae witnesses in four consolidated cases. In *Willie Pearson* and *Lindsay Pearson,* this Court held that the alleged res gestae witness was not in fact a res gestae witness. In *Schwartz* and *Wynn,* this Court held that the prosecution's efforts to produce the missing res gestae witness did not rise to the level of due diligence.

We note first that the prosecution's duty to produce res gestae witnesses might be less strict than its duty under the Confrontation Clause to produce witnesses whose testimony is offered against the defendant.

Schwartz was convicted of delivery of heroin. The police officer making the arrest was introduced to Schwartz by one Don Cager, an informant who was present during the sale. Cager was endorsed on the information but was not produced at trial.

The last time that the prosecution had seen Cager was six months before Schwartz' trial. In the five weeks before Schwartz' trial, the prosecution made several attempts to find Cager, including going to his home and speaking to a local police officer. During trial the prosecution again checked his residence, a boathouse, a firehouse, a pool hall, two bars, and two restaurants.

This Court held that the appropriate standard was due diligence, not just good faith. Even though "[i]t was clear that [the witness] was a res gestae witness who would have to be produced," the prosecution made only belated attempts to find Cager. As in the present case, "[o]f particular concern to this Court, however, is that no serious effort was made sufficiently in advance of trial to allow for the difficulties which occurred." *Pearson, supra,* p 717.

Willie Wynn was convicted of assault with intent to do great bodily harm less than murder. James Moore was one of a number of witnesses to the assault. Moore, a friend of Wynn's, was not endorsed prior to trial, but in response to a defense motion the trial court ordered Moore endorsed and produced at trial. The prosecution did not attempt to serve Moore with a subpoena and made no other efforts to find him. Moore did not appear at Wynn's trial. The trial court found that this lack of effort did not meet the due diligence requirement. This Court affirmed.

In *People v McIntosh,* 389 Mich 82; 204 NW2d 135 (1973), this Court applied the due diligence standard to the prosecution's efforts to locate a witness whose preliminary examination testimony was used against the defendants at trial. Franklin McIntosh was prosecuted for burglarizing a gas station. At McIntosh's preliminary examination, Jerry Wrenn, an employee at the station, testified that he found McIntosh inside the office. McIntosh told Wrenn that he was returning the washroom key and left, driving off with a companion. Wrenn subsequently discovered that the bag containing the day's

*People v Schepps,* 217 Mich 406; 186 NW 508 (1922), describes the sort of thorough efforts that constitute due diligence. The issue at trial was whether Schepps was one of a group of robbers. The preliminary examination testimony of Florence Earl, although neither conclusive nor the sole evidence identifying Schepps as one of the robbers, was highly convincing. Earl was subpoenaed but did not appear at trial. The court continued Schepps' trial a number of times (for an unknown number of weeks) while the prosecution attempted to find her. Officers searched Detroit and followed up rumors that she had moved to Canada, searching Windsor and interviewing her parents in Ontario, and her two sisters "found living elsewhere."

This Court held that these efforts were sufficient to enable the prosecution to use Earl's preliminary examination testimony at trial. In contrast with the instant case, the trial was continued a number

receipts was missing and telephoned the state police, who found the bag under the front seat of McIntosh's automobile. Wrenn also testified that when he entered the office he noticed that the back of McIntosh's sweater "was bunched as if something bulky was being carried underneath it," and that McIntosh, upon leaving the station, leaned into the front-seat area of his car where the money was found.

Wrenn was apparently the only witness who testified that McIntosh, and not his companion, was the thief. The prosecution learned after the preliminary examination that Wrenn had left the state and was either in a North Carolina prison, or living on Webb Avenue in Burlington, North Carolina, possibly under the alias "Danny Hill." The prosecution took the following steps to locate Wrenn: It checked his local home and employer. It telephoned information for Burlington and learned that no Wrenn or Hill was listed on Webb Avenue. It communicated with Burlington police and asked them to check on Wrenn's whereabouts. No reply was ever received. The prosecution did not communicate with North Carolina prison authorities.

Applying the decision of the United States Supreme Court in *Barber v Page,* n 12 *supra,* which this Court read as establishing a due diligence standard, this Court held that the prosecution's efforts failed to rise to the level of due diligence. The prosecution should have sought to locate Wrenn in Burlington and should have communicated with North Carolina prison authorities. "The fact that an attempt may prove unsuccessful does not justify the prosecution's failure to make that attempt, *Barber, supra." McIntosh, supra,* p 87.

of times and the prosecution promptly followed all leads, traveling *itself* to a foreign jurisdiction to look for the witness.

D

Here, as in *Payne,* the prosecution knew that Seidel, Dawson, and Stever had been difficult to locate for the first trial, that they had left the state and had an incentive to go into hiding.

Subsequent belated and incomplete efforts did not rise to the level of good-faith due diligence. The efforts to locate each should have begun earlier. The prosecution knew on May 13 that Dye's retrial was set for August 22, but did not attempt to locate Seidel until one month later, did not attempt to locate Dawson until two months later, and did not attempt to locate Stever until almost three months later. The initial attempts all failed, yet the prosecution did not increase its efforts.

The prosecution relied on the local Cucamonga, Mason City, and Livingston police to do the investigatory work, but was tardy in providing the local police with sufficient information and did not follow up and press the local police to act. Photographs of the witnesses were mailed less than a week before the retrial.

Certificates were sent under the uniform act, but in themselves these did not obligate the local police to undertake a diligent search. The uniform act is a mechanism for the production of witnesses; it does not oblige local police to search for a missing witness. Invocation of the uniform act's mechanism would have become important had Dawson, Seidel, or Stever been found out of state. The act would then have enabled the local police to *produce* the witness for the prosecutor in Michigan. Invocation of the uniform act's production

mechanism, however, is not a substitute in itself for a diligent effort to *find* the witnesses.[23]

The prosecution's obligation to make a diligent good-faith effort is nondelegable. If the prosecution relies on out-of-state police to follow particular leads, and they make a diligent good-faith effort to find and produce the witness, then their efforts may discharge the prosecution's obligation. In the instant case, however, there is no evidence that the out-of-state police made diligent good-faith efforts. The Mason City police believed Seidel was living at home with his mother, but apparently only visited the home once. The Cucamonga police believed Dawson was living and working in the

[23] Where a witness is beyond a court's jurisdiction, use of the uniform act may be required in all cases. See *Barber v Page,* n 12 *supra,* p 723 (while the fact that the witness was outside the court's jurisdiction may at one time have excused the prosecution from producing him, because of developments like the uniform act, "it is clear that at the present time increased coöperation between the States themselves and between the States and the Federal Government" now requires the prosecution to engage in diligent efforts to produce witnesses who may be beyond the court's jurisdiction); *People v Gaffney,* 51 Mich App 526; 215 NW2d 587 (1974) (distinguishing *People v Serra,* 301 Mich 124; 3 NW2d 35 [1942], and holding that the prosecution's failure to utilize the uniform act barred a finding of good-faith diligence).

Other states that have considered the matter agree that use of the uniform act is required in at least some circumstances. See *State v Kaufman,* 304 So 2d 300, 303 (La, 1974); *State v Kirk,* 211 Kan 165, 170-171; 505 P2d 619 (1973).

In *People v Serra, supra,* this Court said that the prosecution's failure to produce at trial an indorsed res gestae witness who had moved to Buffalo, New York, did not bar a finding of due diligence. There was no question of using any prior testimony against the defendant.

In *People v Hunley,* 313 Mich 688; 21 NW2d 923 (1946), the prosecution offered the preliminary examination testimony of a witness who had subsequently been inducted into the Army and sent to Kentucky. The witness was not vital to the prosecution's case. This Court emphasized that the witness' "testimony was corroborated in almost every detail by other witnesses." *Hunley, supra,* p 692. This Court also observed that the defendant did not in her brief assert that the prosecution should have utilized the uniform act, and that no showing had been made that Kentucky had enacted a reciprocal provision, which the act requires before it can be utilized.

area, yet apparently made only one visit to his suspected residence and did not attempt to find where his employment lead may have led. The efforts did not constitute good-faith due diligence.

The prosecution should have begun the searches earlier, pressed local officers to engage in the searches, and perhaps, as in *Schepps*—in light of the inadequate efforts of the local police—sent its own investigator. The prosecution undertook none of these steps. Such "affirmative measures" may well have produced the witnesses.

III

Dye asserts that two lines of inquiry by the prosecution in its case in chief were improper. The first was questions put to Seidel, Dawson, Stever, and Richard Troher[24] whether Dye had in their presence accused anyone else of committing the killings. The second was questions put to these four witnesses whether Dye had accompanied them to make a statement to the police.

We agree with Dye that questioning Troher whether Dye had accused anyone else of the killings, and questioning all four witnesses whether Dye had made a statement to the police, was improper. It would not have been "natural," within the meaning of *People v Collier,* 426 Mich 23; 393 NW2d 346 (1986), for Dye to have made such accusation in Troher's presence or to have made a statement to the police. On remand, these questions should not be asked during the prosecution's case in chief.

Questioning Seidel, Dawson, and Stever whether

---

[24] Troher was a member of the Forbidden Wheels, but was not in the clubhouse at the time of the killings.

Wilfred David's testimony, adverted to in the opinion to affirm, was not adverted to in Dye's brief in this Court.

Dye accused anyone else of the killings, however, was not improper. Their testimony that Dye failed to accuse anyone else of the killings correlated with their testimony that Dye had confessed the killings to them. This questioning may be allowed on remand.

### A

Dye testified that he did not kill the two women. He said that Seidel killed the women, and that he had been sleeping and was awakened by the shots.[25] By his own admission, however, Dye was an accessory after the fact. He participated with Seidel, Dawson, and Stever in cleaning up the clubhouse and joined Seidel in disposing of the bodies.

Prior to his arrest, Dye did not speak with the police of his involvement in the killings. Dye did not tell police that Seidel was the killer.

### B

In *People v Collier, supra,* this Court adopted the evidentiary standard set forth in *Commonwealth v Nickerson,* 386 Mass 54; 434 NE2d 992; 35 ALR4th 722 (1982). As a general rule, the prosecution cannot impeach a defendant on the basis of his prearrest silence. "Allowing impeachment with prearrest silence suggests that a defendant has a duty to incriminate himself and burdens his right to testify on his own behalf." *Collier, supra,* p 34. This is inappropriate because " 'it is a generally held notion that one does not have to say anything to the police and that what one does say may be used against him.' " *Id.*[26]

---

[25] For a more complete factual summary, see n 4.

[26] Quoting *Nickerson, supra,* 386 Mass 61.

In *Collier,* this Court held that the prosecution's impeachment of defendant Collier's prearrest silence was proper. Collier, according to his testimony, had acted in self-defense. He "testified that he was in fact the victim of an armed robbery rather than a perpetrator of an assault." *Id.,* p 34. The Court concluded that it would have been natural for Collier to contact the police:

> [W]e believe it is entirely natural and expected that one who has been robbed under the circumstances related by the defendant would report the crime to the police. Defendant knew the identity of the robber and the location of the robbery. It would have been natural for him to report the crime to the police, to have the assailant arrested, and to retrieve his property. [*Id.,* pp 34-35.]

Where it would not have been natural for the defendant to contact the police—where doing so may have resulted in the defendant incriminating himself—the prosecution cannot properly comment on the defendant's failure to contact the police.[27]

We conclude that it would not have been natural for Dye to have made a statement to the police because if he had done so such a statement would have tended to incriminate him as an accessory after the fact.

C

Nor would it have been natural for Dye to have

---

[27] See also *Farley v State,* 717 P2d 111 (Okla Crim App, 1986) (evidence of prearrest silence is more prejudicial than probative of a defendant's guilt); *State v Sabbah,* 13 Ohio App 3d 124, 136; 468 NE2d 718 (1982) ("Persuasively reasoned authority supports the proposition that *all* pretrial silence is usually so prejudicial in disproportion to its probative worth that exclusion is warranted in all but exceptional cases" [emphasis in original]); *People v Conyers,* 52 NY2d 454; 420 NE2d 933 (1981) (state rules of evidence generally preclude the use of a defendant's pretrial silence to impeach his trial testimony).

accused someone else in Troher's presence. According to Dye, he was an accomplice after the fact; hence an accusation of Seidel would also have incriminated Dye. Further, there was no apparent incentive for Dye to have, in Troher's presence, accused Seidel. An accusation of Seidel by Dye in Troher's presence would not have aided Dye.

Questioning Seidel, Dawson, and Stever concerning Dye's failure to accuse anyone else of the killings, however, was not improper. In contrast to Troher, Seidel, Dawson, and Stever testified that Dye had confessed to them that he had committed the killings. Their further testimony that Dye had not accused anyone else of the killings correlated with their testimony concerning his confession. If Dye had in fact confessed to Seidel, Dawson, and Stever that he was the killer, he would not have accused anyone else of the offenses. This questioning merely restated in a different form the properly admitted testimony concerning Dye's confession.

### D

Questioning the three witnesses concerning Dye's failure to make a statement to the police,[28] however, did not reciprocate their testimony that Dye had confessed. Applying the *Collier* analysis, it would not have been natural for Dye to have made a statement to the police for the reasons set forth above: Dye, according to his own testimony, was an accomplice after the fact, and any statement that he made would have incriminated him.

Because it would not have been "natural" for Dye to have made a statement to the police, on remand the prosecution should not in its case in

[28] See n 29.

chief ask questions concerning or adverting to
Dye's failure to make a statement to the police.

E

Dye on direct examination testified that he did
not make a statement to the police because his
attorney advised him not to do so.[29] The prosecu-
tion asserts that because Dye offered this testi-
mony, the prosecution could have subsequently
offered impeaching testimony, and therefore—even
if the prosecution improperly included the testi-
mony in its case in chief—any error was harmless.
On these facts, the prosecution's argument is cir-
cular.

---

[29] The opinion to affirm states:

> The prosecution did not make any inquiry in its case in chief
> regarding Dye's prearrest failure to make a statement, Dye's
> failure to make a postarrest statement to the homicide investi-
> gator, or his postarrest statement to the arson investigators.
> [*Post,* p 112.]

During the prosecution's case in chief, the following questions were
put to and responses elicited from Troher:

> *Q.* To your knowledge, did there come a time when Mr. Dye
> was arrested?
> *A.* Yes.
> *Q.* Before that arrest, had you turned yourself in, so to speak,
> or had you gone down to the police, let me use it that way.
> *A.* I believe so.
> *Q.* Mr. Dye did not go down with you to the police?
> *A.* No.

The prosecution, during its case in chief, also elicited testimony
from Seidel, Dawson, and Stever that although Dye did not want
them to consult an attorney, they did so and made statements to the
police. The purpose of this testimony was to emphasize Dye's prear-
rest failure to make a statement to the police even though he knew
that others were making such statements: "In effect, the prosecutor
asked the question 'Is it natural to expect the defendant to go to the
police and report his version of the offense knowing of the similar
inclination of the other witnesses?' "

In all events, on remand Dye should be able to avoid misunderstanding concerning his intentions by an affirmative statement in limine whether he intends, absent inquiry by the prosecution in its case in chief, either to claim that his prearrest conduct tended to indicate his innocence, or to explain why he did not make a statement to the police, or to refer to his statement to the arson investigators.[30]

We reverse the decision of the Court of Appeals and remand for a new trial.

CAVANAGH and ARCHER, JJ., concurred with LEVIN, J.

ARCHER, J. (*concurring*). The prosecution failed to show due diligence in producing the principal res gestae witnesses. The trial court abused its discretion in its finding of due diligence and in allowing the prosecution to use the previous trial testimony of the principal witnesses. The defendant was denied the opportunity to confront and cross-examine the witnesses. I would, therefore, reverse the decisions of the Court of Appeals and

---

[30] The opinion to affirm would "hold that the evidentiary errors alleged by the defendant did not result in a miscarriage of justice." *Post,* pp 116-117.

The opinion refers to *Doyle v Ohio,* 426 US 610; 96 S Ct 2240; 49 L Ed 2d 91 (1976), and states that the United States Supreme Court there "held that use of postarrest, post-*Miranda* warning silence for impeachment was 'fundamentally unfair and a deprivation of due process . . . .' *Id.* at 618." *Post,* p 107.

The opinion further states:

For the purpose of deciding the remaining claims of error concerning the testimony of David and Troher, we assume arguendo under *People v Collier,* 426 Mich 23; 393 NW2d 346 (1986), that the trial judge erred in permitting the prosecutor to question these witnesses concerning defendant's prearrest conduct. [*Post,* p 114.]

The opinion to affirm does not state that Dye's prearrest silence was admissible under *Collier.*

the trial court and remand the case for a new trial.

I

The defendant, Paul Dye, was charged with a double murder committed in August, 1982, at the headquarters of the Forbidden Wheels Motorcycle Club. Evidence adduced at trial established that four members of the Forbidden Wheels, Bruce Seidel, Stephen Stever, James Dawson, and the defendant, were in the building at the time two women were killed inside the club.

It was established that when the murders occurred, the defendant and Seidel were in the room with the victims while Dawson and Stever were in an upstairs room. During the trial, the defendant and Seidel each accused the other of shooting and killing the victims. Seidel testified that after witnessing the shootings, he went upstairs and informed Stever and Dawson. Stever and Dawson testified that Seidel did tell them that the defendant had shot two people but, because they were not eyewitnesses, they could not verify either version of the shooting itself.

All four testified that they assisted in cleaning up the room where the shooting occurred. Seidel testified that he and the defendant disposed of the bodies by dumping them in a vacant lot. Although it was undisputed that all four had participated in covering up the crime, only the defendant was charged with murder. Seidel, Stever, and Dawson were not charged in exchange for their testimony.

The jury was required to evaluate the credibility of the witnesses on the basis of their demeanor and the factual and logical consistency of their testimony. The jury failed to reach a unanimous verdict. A mistrial was declared. It was later

learned that the jury voted eleven to one in favor
of acquittal.

The prosecution requested a second trial of the
defendant. Unlike the first trial, the three princi-
pal witnesses were not housed in a secure place at
a hidden location. No material witness bonds were
requested, nor were addresses required from
Stever, Dawson, or Seidel, although it was known
that all three of the men planned to leave the
state. On May 13, 1983, a new trial date of August
22, 1983, was set.

Several weeks later, in June, 1983, the police
began sporadic, unsuccessful attempts to locate
Seidel. No attempt was made to locate Dawson
until July, and it was not until August, approxi-
mately three weeks before trial, that attempts
were made to serve Stever with a subpoena.

In attempting to locate Seidel, the police con-
tacted his mother in Mason City, Iowa, who said
he was working out of town. There is no indication
in the record that they asked her to specify where
he was. In the case of Dawson, the prosecutor had
learned earlier that he might seek to avoid further
involvement with the trial. Yet he waited until
after he got further confirmation that Dawson was
going to avoid the second trial and subsequently
found Dawson's phone disconnected when he con-
tacted the police for assistance in locating Dawson.
The attempt to locate Stever was even less dili-
gent. The first attempt was an inquiry of Dawson's
mother. Dawson's mother could not tell the police
where her son was, so it was highly unlikely that
she could help the police locate Stever.

The prosecutor waited until seventeen days be-
fore the trial to attempt to locate the witnesses
using the uniform act to secure the attendance of
witnesses from without a state in criminal pro-
ceedings, MCL 767.91 *et seq.;* MSA 28.1023(191) *et*

*seq.*[1] The first time that the prosecutor indicated that there were some witnesses that had yet to be served with subpoenas was at a hearing on the defense counsel's motion to adjourn. The defense counsel was newly engaged, however, and therefore unfamiliar with the importance of the missing

---

[1] The relevant sections of the uniform act, MCL 767.91 *et seq.;* MSA 28.1023(191) *et seq.,* read as follows:

(a) "Witness" includes a person whose testimony is desired in any proceeding or investigation by a grand jury or in a criminal action, prosecution or proceeding. [MCL 767.91(a); MSA 28.1023(191)(a).]

(1) If a person in a state, which by law provides for commanding persons within its borders to attend and testify in criminal prosecutions, or grand jury investigations commenced or about to commence, in this state, is a material witness in a prosecution pending in a court of record in this state, or in a grand jury investigation which has commenced or is about to commence, a judge of the court may issue a certificate under the seal of the court stating these facts and specifying the number of days the witness will be required. The certificate may include a recommendation that the witness be taken into immediate custody and delivered to an officer of this state to assure his attendance in this state. This certificate shall be presented to a judge of a court of record in the county in which the witness is found.

(2) If the witness is summoned to attend and testify in this state he shall be tendered the sum of 10 cents for each mile of the ordinary traveled route to and from the court where the prosecution or investigation is being held and $5.00 for each day that he is required to travel and attend as a witness. A witness who has appeared in accordance with the provisions of the summons shall not be required to remain within this state longer than the period stated in the certificate, unless otherwise ordered by the court. If the witness, after coming into this state, fails without good cause to attend and testify as directed in the summons, he shall be punished in the manner provided for the punishment of any witness who disobeys a summons issued from a court of record in this state. [MCL 767.93; MSA 28.1023(193).]

Sections 91 to 95 constitute the uniform act to secure the attendance of witnesses from without a state in criminal proceedings and shall be so interpreted and construed as to effectuate their general purposes to make uniform the law of the states which enact them. [MCL 767.95; MSA 28.1023(195).]

witnesses. It was not until August 16, 1983, six days before the trial, that the prosecutor sent pictures of the three men to the respective states in which they were being sought. *The prosecutor did not inform the defense counsel which witnesses were unavailable until the day the trial was to begin.* The prosecution sought to introduce transcripts of their prior testimony to be read into evidence under MCL 768.26; MSA 28.1049 and MRE 804(b)(1).[2]

A hearing was conducted to determine whether due diligence was exercised in attempts to locate these crucial witnesses for the second trial. The trial court ruled that the prosecution exercised due diligence and permitted the use of the trial transcript from the first trial.

The defendant was found guilty as charged. He appealed in the Court of Appeals, which affirmed on the basis of defense counsel's failure to seek an adjournment.

II

The statute under which the prior testimony was admitted into evidence, MCL 768.26; MSA 28.1049, states:

Testimony taken at an examination, preliminary

---

[2] MRE 804(b)(1) states:

(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

hearing, or at a former trial of the case, or taken
by deposition at the instance of the defendant,
may be used by the prosecution whenever the
witness giving such testimony can not, for any
reason, be produced at the trial, or whenever the
witness has, since giving such testimony become
insane or otherwise mentally incapacitated to tes-
tify.

Use of prior recorded testimony in place of live
testimony of endorsed res gestae witnesses is sub-
ject to the defendant's fundamental right to con-
front witnesses under the Michigan Constitution
as well as the Constitution of the United States.
*Barber v Page,* 390 US 719; 88 S Ct 1318; 20 L Ed
2d 255 (1968); *People v McIntosh,* 389 Mich 82; 204
NW2d 135 (1973). In *Barber,* the United States
Supreme Court held that this confrontation right
requires the prosecution to produce such endorsed
witnesses and that an exception to this require-
ment is not available "unless the prosecutorial
authorities have made a good-faith effort to obtain
[the witness'] presence at trial." *Barber, supra* at
725.

Justice Marshall, writing for the majority in
*Barber* at 721, stated:

Many years ago this [United States Supreme]
Court stated that "[t]he primary object of the
[Confrontation Clause of the Sixth Amend-
ment] . . . was to prevent depositions or *ex parte*
affidavits . . . being used against the prisoner in
lieu of a personal examination and cross-examina-
tion of the witness in which the accused has an
opportunity, not only of testing the recollection
and sifting the conscience of the witness, but of
compelling him to stand face to face with the jury
in order that they may look at him, and judge by
his demeanor upon the stand and the manner in
which he gives his testimony whether he is worthy

of belief." *Mattox v United States,* 156 US 237, 242-243 [15 S Ct 337; 39 L Ed 409] (1895). More recently, in holding the Sixth Amendment right of confrontation applicable to the States through the Fourteenth Amendment, this Court said, "There are few subjects, perhaps, upon which this [United States Supreme] Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v Texas,* 380 US 400, 405 [85 S Ct 1065; 13 L Ed 2d 923] (1965).

Michigan courts have, until now, fully embraced this doctrine and have therefore required that prosecutors exercise "due diligence" in attempts to secure the presence of witnesses before prior testimony is admissible. In *People v McIntosh, supra* at 86, this Court cited *Barber,* stating that "the prosecution must show due diligence in their efforts to produce [endorsed res gestae] witnesses." Indeed, even prior to its recognition that the Sixth Amendment was incorporated into the Fourteenth Amendment and thus applicable to the states, this Court had held that the prosecution was required to exercise due diligence to produce material witnesses at trial. See, e.g., *People v Zabijak,* 285 Mich 164; 280 NW 149 (1938); *People v Vick,* 235 Mich 475; 209 NW 584 (1926).

III

The diligence due in a given case necessarily varies with the circumstances. Law enforcement authorities must not be unduly burdened with a duty to locate witnesses whose testimony would merely relate to preliminary or unimportant matters. At the other extreme, however, are cases

where eyewitness testimony relating to an ultimate fact such as the identity of the perpetrator of a felony must be tested *in the presence of the jury* for credibility and consistency in order to satisfy the requirements of due process.

In the instant matter, it is obvious that the first mistrial resulted from the jury's inability to give credence to the testimony of Seidel, Stever, and Dawson. The inability of the jury at the second trial to view the demeanor of these witnesses therefore greatly reduced the validity and reliability of its evaluation of the witnesses' credibility. In fact, over the objection of the defense counsel, the individuals reading the prior testimony in the second trial were allowed to embellish the written words with dramatic effects.[3] As a result, the

---

[3] The following colloquy took place between the defense counsel and the court:

> *Mr. Morrow:* Just one thing I'd like to put on the record. As the witness was testifying, I noticed that there were certain hand motions or whatever and I don't know, necessarily, if they were appropriate or if they had any prejudicial effect on the jury. Making those—I don't think he was present at the first trial—so I don't know if they could actually be deemed accurate. I'd just like to put that on the evidence for possible prejudice.
>
> [*The Court*] See you at 3 o'clock.
>
> (Whereupon this case was in recess at 12:44 p.m.)
>
>          *   *   *
>
> (Whereupon at 4:45 p.m., the jury was excused and the following proceedings held outside the presence of the jury.)
>
> *The Court:* Per discussion in chambers, I think there is an objection or two, if not more, to what the jury just heard or did not hear, Mr. Morrow?
>
> *Mr. Morrow:* Thank you, your Honor. In terms—let me just talk generally about the reading of witness of Steve Stevers. It was my impression this was going to be a neutral reading. I'd just have to put on the record that the witness that read the part of Stephen Stevers was into dramatic art. I mean, certainly his facial expressions, his attempts to add inflections when there might have not been any, I just don't think it was any way neutral, and as a result, I think it was very prejudicial to Mr. Dye. I would ask that the . . .

defendant's right to a fair trial was greatly hampered, thus violating his right to due process of law.

This due process violation cannot be excused on the basis of any exception to the defendant's right to confront witnesses. Although the defense counsel apparently conceded the good faith of the prosecutor, it is clear that the efforts of the police and the prosecutor to locate the witnesses fell short of the due diligence requirement recognized in *People v McIntosh, supra.*

The failure to inquire as to the specific whereabouts of Seidel precludes reliance on contacts with Seidel's mother as evidence of due diligence. Similarly, the sporadic attempts to locate Dawson and Stever were clearly less than adequate. This would seem to be the "cursory or pretextual investigation" referred to by the opinion for affirmance, *post,* p 101, n 6, as inadequate evidence of due diligence. The uniform act to secure the attendance of witnesses from without a state in criminal proceedings may not be relied on to establish due diligence. This statute, originally promulgated by

---

*The Court:* The record is also clear there was no objection during the reading.

*Mr. Morrow:* It was my understanding that we were going to add the objections later. I don't know if I should.

*The Court:* I think that's [sic] if that's a valid objections [sic]. That's certainly the kind of objection you would clearly bring up while it was going on.

*Mr. Morrow:* I'd like to ask the Court, then, for the next person that is going to be the reader of Bruce Seidel, that if there's any way possible that the voice just be heard by the jury, as opposed to facial expressions, because I'm sure that that's going to have me jumping up, now that I know that that's the way the Court wishes it. It would have me jumping up all the time.

*The Court:* No. I would state that Mr. Bernacki read with perhaps more inflection in his voice than did Mr. Hutting, and if counsel had approached the bench we would have informed Mr. Bernacki to simply read it in a natural manner. Counsel did not choose to do so and, thus, the Court was not going to take it upon itself to tell Mr. Bernacki how to read.

the National Conference of Commissioners on Uniform State Laws, was designed merely to codify a procedure whereby each state would have a standard for honoring a request by another state for assistance in securing a witness for a criminal trial. There is no indication that this statute was intended to set a standard for due diligence. Such an intent would surely mandate the inclusion of a time frame for use of the statute to ensure that authorities in a state receiving a request would have adequate time to locate the witness sought. In the instant case, the prosecutor waited until seventeen days before trial to invoke the act. It was not until August 16, six days before the trial, that the prosecutor sent pictures of the three men to the respective states in which they were being sought.

Finally, the prosecutor's delay in informing the defense counsel of the absence of the witnesses resulted in an unfair eleventh-hour surprise. As early as March, 1983, there were indications that the witnesses might be unavailable for a second trial. Surely it was clear by August 5, when the uniform witness act packets were sent, that the witnesses would be difficult to locate. The Court of Appeals affirmance was based in part on defense counsel's failure to seek an adjournment. However, the newly engaged defense counsel's unfamiliarity with the case precluded him from recognizing the importance of the missing witnesses. In any event, it may have appeared to be futile to request an adjournment in that the trial judge had refused an earlier request to adjourn so that the new defense counsel could adequately prepare for trial.

IV

*Barber v Page* and *People v McIntosh, supra,*

recognized that a defendant's Sixth Amendment confrontation right cannot be overcome without a clear showing that good-faith, diligent efforts were made to produce material witnesses. In this case, due diligence has not been shown by the prosecution; therefore, the trial court abused its discretion. I would reverse the decisions of the Court of Appeals and the trial court and remand the case for a new trial.

V

I do not agree with the analysis of the opinion for affirmance and the result in the second issue. I disagree with the application of *Jenkins v Anderson,* 447 US 231; 100 S Ct 2124; 65 L Ed 2d 86 (1980), and the extension of *People v Collier,* 426 Mich 23; 393 NW2d 346 (1986). See *Collier,* pp 40-45. I do not address this disagreement with specificity because of my finding of a lack of due diligence which would reverse the decisions of the Court of Appeals and trial court resulting in a remand for a new trial.

CONCLUSION

I would reverse the decisions of the Court of Appeals and the trial court and remand the case for a new trial.

BRICKLEY, J. (*concurring*). I concur in parts I and II of Justice LEVIN's opinion and in part III of Justice BOYLE's opinion. Accordingly, because of the violation of the due diligence standard, I concur with the result of Justice LEVIN's opinion reversing the conviction.

BOYLE, J. (*dissenting*). We are asked in this case to consider two issues: Whether the trial court

abused its discretion in finding that the Wayne County Prosecutor exercised due diligence in attempting to locate three witnesses for the defendant's retrial, and whether evidence regarding the defendant's prearrest silence was properly admitted. We would affirm the decision of the Court of Appeals.

## I. FACTS

Defendant, Paul Dye, was charged with two counts of first-degree murder in the killing of two women whose bodies, with gunshot wounds to the head, were found by police officers in a vacant lot. Evidence indicated that the women had been killed at the headquarters of the Forbidden Wheels Motorcycle Club and that they had been shot at close range.

At trial, three members of the motorcycle club testified that the defendant, who at that time was president of the Forbidden Wheels, had murdered the women and had then enlisted their help in cleaning up after the killings and in covering up the crime. One of the witnesses, Bruce Seidel, asserted that he had been present at the time of the murder and had watched Dye shoot the women. Seidel testified that the women entered the motorcycle club headquarters at approximately 2:30 A.M. and began drinking. Some time later, according to Seidel, one of the women and Dye began discussing whether the woman would perform oral sex on Dye. Seidel further testified that after some minutes of discussion and argument, the defendant stated, "why bitch you will," and, pulling a gun from his waistband, held it against her forehead and fired, at which point "[h]er head exploded." Additionally, Seidel asserted that a few seconds later, when the other

woman cried, "I don't believe what's happening," the defendant responded, "I do," and also shot her through the head. At that point, according to Seidel, Dye turned and stared at him for a short time, and then Seidel indicated that he would let two other members, Stephen Stever and James Dawson, who were sleeping upstairs, know what had happened.

Stever and Dawson also testified, corroborating Seidel's story from the point that he appeared upstairs to announce that "Rocky[1] just shot two women downstairs and he believed they were dead." All agreed that they went downstairs and helped to clean up. Seidel testified that he helped Dye dispose of the bodies, which were dumped in a vacant lot, and that he had secreted the murder weapon in the clubhouse. Afterwards, the four gathered at Stever's house. Dawson testified that Dye indicated to him that he shot the women because they were "a couple of fat cunts" and "they were fucking with me." Stever indicated that he saw Dye holding the gun when he came downstairs and that later Dye "mentioned the fact that after he took out the first one, he had to take the second one and he looked over at Bruce and thought about shooting him too. Then, he would have to come upstairs and shoot both of us." All three testified that Dye initially urged everyone to keep quiet and stick to their alibis. Dawson and Seidel also testified that on the day after the shootings they had another conversation in which they told the defendant they should seek the advice of an attorney, and defendant told them not to talk to a lawyer. It was claimed by defendant in his direct testimony at trial, however, that he, himself, had contacted a lawyer the day after the homicides and that he had arranged for a meeting

---

[1] "Rocky" was Dye's club nickname.

of the club members with the attorney, and he and
the attorney had agreed that "he was going to set
up a meeting between the homicide detectives, in
charge of the case and each and each [sic] and
every club member to make a statement to the
homicide detectives." Dawson, Stever, Seidel, and
two other witnesses, Richard Troher and Wilfred
David, did arrange through an attorney to give
statements to the police. A decision was made not
to charge Seidel, Dawson, or Stever, who were
kept in "protective custody"[2] for four days before
trial.[3]

At trial, the defendant took the stand and testi-
fied that it was Seidel who committed the killings.
According to the defendant, he, Seidel, Dawson,
and Stever had "agreed to conceal the whole inci-
dent." The defendant had not previously made any
statement to this effect.

The jury was unable to reach a verdict at the
first trial, and the judge declared a mistrial. On
May 13, 1983, a new trial date of August 22, 1983,
was set. On June 2, 1983, according to the police
sergeant in charge of the case, the police and
assistant prosecutor began efforts to locate Seidel,
Stever, and Dawson. By the time of trial, these
efforts had proven fruitless and a motion was
made to allow the first trial testimony of the three
witnesses to be read into evidence under MCL
768.26; MSA 28.1049 and MRE 804(b)(1).

The trial judge conducted a hearing to deter-
mine whether the prosecutor had exercised "due
diligence" in attempting to locate and produce the
witnesses as required for the admission of the

---

[2] They were kept at a Detroit area motel under assumed names
where their meals and room receipts were paid by the prosecution.
While they were not allowed to leave until after they testified, they
were not under arrest as material witnesses pursuant to MCL 767.35;
MSA 28.975.

[3] Upon the conclusion of their testimony, they were given airfare to
their previous places of residence outside Michigan.

prior testimony. The trial court found in the prosecutor's favor and allowed the testimony of Seidel, Dawson, and Stever to be read at trial. The jury convicted Dye of two counts of first-degree murder and two counts of possession of a firearm during the commission of a felony. Dye was sentenced to life imprisonment. The Court of Appeals affirmed the conviction, and we granted leave to appeal.

## II. DUE DILIGENCE

The Supreme Court of the United States in *Barber v Page,* 390 US 719, 725; 88 S Ct 1318; 20 L Ed 2d 255 (1968), held that a witness is "unavailable" for the purpose of an exception to the confrontation requirement if "the prosecutorial authorities have made a good-faith effort to obtain his presence at trial."[4] In Michigan, MCL 768.26; MSA 28.1049 provides:

---

[4] Justice LEVIN relies upon that Court's earlier decision in *Motes v United States,* 178 US 458, 471, 473-474; 20 S Ct 993; 44 L Ed 1150 (1900), which held that the defendant was denied his right of confrontation under the Sixth Amendment when the failure to produce a key witness for the prosecution was due to the negligence of a governmental agent. The Court opined:

> [T]he admission in evidence of Taylor's statement or deposition taken at the examining trial was in violation of the constitutional right of the defendants to be confronted with the witnesses against them. It did not appear that Taylor was absent from the trial by the suggestion, procurement or act of the accused. On the contrary, his absence was manifestly due to the negligence of the officers of the Government. Taylor was a witness for the prosecution. He had been committed to jail without bail. We have seen that the official agent of the United States in violation of law took him from jail after the trial of this case commenced, and, strangely enough, placed him in charge not of an officer but of another witness for the Government with instructions to the latter to allow him to stay at a hotel at night with his family. And on the very day when Taylor was called as a witness, and within an hour of being called, he was in the corridor of the court house. When called to testify he did not appear.

\* \* \*

Testimony taken at an examination, preliminary hearing, or at a former trial of the case, or taken by deposition at the instance of the defendant, may be used by the prosecution whenever the witness giving such testimony, can not, for any reason, be produced at the trial, or whenever the witness has, since giving such testimony become insane or otherwise mentally incapacitated to testify.

This Court in *People v McIntosh,* 389 Mich 82, 87; 204 NW2d 135 (1973), noted that "the statute must be interpreted in a manner consistent with prevailing constitutional authority." The "good faith" requirement of *Barber* has consistently been viewed in Michigan as mandating that prosecutors exercise "due diligence" in their attempts to produce witnesses before prior testimony is admissible. *McIntosh, supra; People v Starr,* 89 Mich App 342; 280 NW2d 519 (1979).[5]

As Judge RILEY noted in *Starr,* p 345, case law in this state makes it clear that

In the present case there was not the slightest ground in the evidence to suppose that Taylor had absented himself from the trial at the instance, by the procurement or with the assent of either of the accused. Nor (if that were material) did his disappearance occur so long prior to his being called as a witness as to justify the conclusion that he had gone out of the State and was permanently beyond the jurisdiction of the court. His absence, as already said, was plainly to be attributed to the negligence of the prosecution.

In this case the facts do not suggest governmental conduct even approaching that of *Motes.* There is nothing of record to demonstrate that the absence of Dawson, Stever, and Seidel subsequent to the first trial was the result of any illegal police activity, or of the prosecutor's negligence, unless it is suggested that the prosecutor had an obligation to detain these witnesses in the state until completion of the second trial. Consequently, *Motes* is distinguishable and the inquiry remains whether the reviewing court can find a "good faith" effort on the part of the state to produce the witnesses at trial.

[5] The majority relies exclusively on the "good faith" standard of *Barber,* and does not find an independent basis for their conclusion under Michigan law. *Michigan v Long,* 463 US 1032; 103 S Ct 3469; 77 L Ed 2d 1201 (1983).

[t]he determination of due diligence is a matter for
the trial court, and that determination will not be
overturned on appeal unless a clear abuse of dis-
cretion is shown.

It is also clear, as defendant points out in his brief
to this Court, that "[w]hat efforts will actually
constitute due diligence cannot be set out in a
hard and fast list, given the many variables possi-
ble in a given case."

The opinion for reversal characterizes the prose-
cutor's efforts as tardy and incomplete. This con-
clusion is based in part on the observation "that
[the witnesses] had been difficult to locate for the
first trial," and that during the two-month period
*between the mistrial and setting of the trial date*
"the prosecution made no effort to *relocate* [them]
even though [he] knew [they] were needed, and
they had expressed an intention to leave the
state . . . ."

In point of fact, there is no record basis for the
statement that the witnesses had been difficult to
find for the first trial. The record does establish
that the prosecution knew for over a year that
Seidel resided in Mason City, Iowa, with his
mother, that the prosecutor had actually had con-
tact with Dawson "a number" of times between
the first trial and the setting of the second trial,
and that the prosecutor had addresses for all three
that had presumably led to their production at the
first trial. Thus there is no basis for the suggestion
that the prosecutor had a reason to try to locate
these witnesses during the two-month period prior
to the setting of the trial date, much less a reason
to *"relocate"* them before he knew when they
would be needed for retrial.

Indeed, what the record suggests is that it was
Seidel's failure to respond to messages left with his

mother at his known residence prior to July 7 and the prosecutor's learning on July 12 that Dawson's local number was disconnected, that triggered the suspicion that the witnesses might be difficult to locate. Thus, contrary to the suggestion that the two-month delay in prosecution efforts (from March 17 to May 13) is somehow related to the good-faith efforts of the prosecutor, the relevant inquiry is the prosecutor's efforts made during the period between the setting of the trial date and the date of trial. I can find no basis in this record for concluding that the trial judge abused his discretion in finding that these efforts were neither "tardy" nor "incomplete."

The majority's conclusion that the effort was "tardy" is further refuted by the fact that efforts to locate Seidel began within three weeks of the setting of a new trial date and more than two and one-half months before that date. Moreover, the conclusion that the efforts were "incomplete" misfocuses the constitutional test of whether evidence that otherwise satisfies the Confrontation Clause is admissible in a subsequent proceeding. The constitution does not require that the prosecutor undertake every conceivable " 'affirmative measure[ ];' [that] may well have produced the witnesses" in order to satisfy constitutional scrutiny. The Supreme Court has made clear that the "law does not require the doing of a futile act" when testing the diligence of the state's effort to secure a missing witness. *Ohio v Roberts,* 448 US 56, 74; 100 S Ct 2531; 65 L Ed 2d 597 (1980). The test is whether the proponent of the evidence made good-faith efforts to procure the testimony, not whether more stringent efforts would have produced it. *Barber v Page, supra.* "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." *California v Green,* 399 US 149,

189, n 22; 90 S Ct 1930; 26 L Ed 2d 489 (1970) (citing *Barber*).

Thus, we must view this case on its own merits to determine if the finding of "due diligence" by the trial court " 'evidences . . . not the exercise of judgment but defiance thereof . . . .' " *People v Talley,* 410 Mich 378, 387; 301 NW2d 809 (1981). On the facts of this case, we cannot so find.

The evidence of "due diligence" presented to the trial court details the prosecutor's efforts to produce Stever, Dawson, and Seidel. According to Sergeant Kuhnlein, who was in charge of the case, the attempt to locate Bruce Seidel began on June 2, 1983,[6] when an LEIN message was sent to a police officer in Mason City, Iowa, where Seidel was known to frequently stay with his mother and where he was living during the first trial. This officer went to the home and talked to Seidel's mother who told him that her son was working out of town, but that she would give him the message to call Sergeant Kuhnlein. After several unsuccessful attempts to reach Mrs. Seidel by phone, on June 22, 1983, another Detroit police officer completed a call to Mrs. Seidel at 3:00 A.M. She again informed the officer that her son was out of town working, but that she would tell Seidel

---

[6] Defendant claims that a finding of due diligence is precluded in this case because the prosecutor's office did not begin its efforts to locate the three witnesses in adequate time to assure their production at trial. The timing of the efforts is only one of the factors which should be considered in the totality of the circumstances of each case. It is conceivable, for example, that a search begun six months before trial, if nothing other than a cursory or pretextual investigation is done, could be inadequate, while a thorough search, commenced a few weeks before trial, could adequately evidence due diligence. In this instance the record indicates that the new trial date of August 22, 1983, was set on May 13, 1983, and the prosecution began efforts to reach Seidel, the only eyewitness, and therefore the most crucial witness for the state, on June 2, 1983. There is, moreover, no basis for the conclusion that it had clearly been established by July 7 that Seidel was missing. His mother's responses indicated only that he was working midnights out of town.

when he returned. When Seidel did not call, the prosecuting attorney in Mason City, Iowa, was called and a subpoena sent to enlist his help in locating the witness. On August 5, pursuant to the interstate witness act, MCL 767.91 *et seq.;* MSA 28.1023(191) *et seq.,* the Wayne County Prosecutor's Office sent a package containing the following information to the Mason City County Attorney's office: a certificate to secure the attendance of a witness from without the State of Michigan in a criminal proceeding, an affidavit for certificate, a certificate of the judge of the Recorder's Court, and a certificate of the clerk of the court for attendance. On August 11, an arrest warrant was issued for Seidel. His girlfriend and his mother were again contacted, as was a biker's establishment. A picture was sent on August 16. Follow-up calls were made to determine if the packets had been received and to check on the progress.

With regard to James Dawson, the assistant prosecutor testified that he had been in telephone contact with the witness until late June or early July. Dawson, in communication with the prosecutor's office because of reports that the defendant was being allowed out on bail between the first and second trials, had been informed of the trial date.[7] Sergeant Kuhnlein reported that on July 6, 1983, he contacted Dawson's mother who stated that she did not know where her son was. On July 12, 1983, the prosecutor attempted to call Dawson, but found that the telephone service had been disconnected. On August 1, 1983, Sergeant Kuhnlein went to Dawson's last known local address, but found that the home had been sold and that the new owner did not know of the witness' whereabouts. Sergeant Kuhnlein then contacted the post office and received a tentative new address in San

---

[7] Defendant was released on bond on June 17, 1983.

Bernadino County, California. On August 5, 1983, an out-of-state witness packet was mailed to the San Bernadino Prosecutor's Office, followed by a picture on August 16, 1983. In the meantime, follow-up calls determined that at least two attempts had been made to serve Dawson at the address, but the San Bernadino Prosecutor's Office had been informed that he was not there at that time. The assistant prosecutor indicated that he would appreciate any further investigation they could do and that any information obtained before August 26, 1983 (the trial was expected to last at least four days) should be passed on.

Sergeant Kuhnlein, in his attempt to locate Stever, first asked Dawson's mother for information and then attempted to serve a subpoena at his local address on August 1, 1983. A tenant who was living at the address informed him that the house was in foreclosure and he had no idea as to the whereabouts of Stephen Stever. The tenant did not pay rent to Stever, but had previously given it to someone who came by to pick it up. Attempts were made to find a forwarding address for Stever at the post office, but none was on file. On August 5, 1983, a packet of materials in conformity with the interstate witness act was sent to Overton County, Tennessee, where Stever was known to occasionally stay, although no street address was known. A picture was sent on August 16, 1983. Follow-up calls determined that the Overton County officials had been unable to locate Stever.

In addition to these efforts, Sergeant Kuhnlein checked all of the jails, morgues, and hospitals in Wayne, Oakland, and Macomb counties and contacted the Michigan Employment Security Commission and the Department of Social Services. The utility companies were also called for any forwarding addresses, but none were known.

The lead opinion suggests that the prosecution should have taken further efforts to secure the missing witnesses such as sending its own investigator out of state to seek them out, urging the out-of-state authorities to exert further efforts, or suggesting that locales frequented by bikers be checked. This observation ignores the fact that the test for admissibility under the Confrontation Clause is the good-faith effort of the prosecution, not whether extraordinary efforts might have been made.[8] Local police obviously have no authority to direct the efforts of the foreign jurisdiction in locating a missing witness, and local resources would just as obviously not permit sending local police out of state in every similar instance. It is clear that what *Barber v Page* requires is a good-faith effort to notify witnesses and secure their attendance, not an all-out manhunt. Thus, as the Court observed in finding compliance with the duty of good faith in *Ohio v Roberts, supra,* p 75 "[t]o be sure, the prosecutor might have tried to locate by telephone the San Francisco social worker . . . and might have undertaken other steps in an effort to find [the witness]. One, in hindsight, may always think of other things."

It is only in hindsight, and by the suggestion of "other things," that the majority concludes that the trial court abused its discretion in finding due diligence on the part of the prosecution.[9] It is

[8] It also ignores the fact that a biker's locale was checked in Mason City and that the prosecutor testified that he spoke with the state's attorneys in all three jurisdictions and asked them "to make whatever efforts they could."

[9] Justice LEVIN relies upon the decision of the Illinois Court of Appeals in *People v Payne,* 30 Ill App 3d 624; 332 NE2d 745 (1975), for the proposition that good faith was lacking in this instance. The basis of the Court's decision in *Payne* was:

The responsibility for the conduct of the People's case rests with the State's Attorney, and not with the police. It is his duty

obvious in retrospect that the witnesses were avoiding appearance. The prosecutor attempted to locate Seidel, Stever, and Dawson through their known local addresses, and sent packets in conformity with the interstate witness act for all three witnesses to the only other locations at which the evidence indicated they might be found. Follow-up calls were also made to try and secure the coöperation of the out-of-state prosecutors. Under these circumstances, "due diligence" could reasonably be found in this case, and we would affirm the decision of the trial court in this regard.[10]

### III. PREARREST SILENCE

Defendant also contends that several questions regarding his prearrest conduct denied him his rights under the Fifth Amendment of the United States Constitution and article 1, § 17 of the Michi-

to supervise and coördinate the efforts to locate the witness known to be missing. This record discloses an absence of any such supervision or coördination. [*Id.*, 628.]

The record in *Payne* indicated that the prosecutor had done nothing to assist in locating the missing witness and had left that task to the indiscriminate efforts of a single police officer.

Unlike the circumstances in the instant case, the prosecutor had made no effort to locate this witness, and it was this fact, the complete failure of the prosecutor to supervise and coördinate the search effort, which lead the Illinois Court of Appeals to conclude that "good faith" on the part of the state was lacking in that instance.

[10] Defendant asserts, without presentation of any factual evidence, that the assistant prosecutor should not be found to have exercised due diligence in this case because, "the prosecution had contributed to the absence of at least one or more of the witnesses." "[A]ppellant [may not] simply . . . announce a position or assert an error and then leave it up to the [appellate] Court to discover and rationalize the basis for [appellant's] claims . . . ." *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). In this regard, we also note that the appellee contends that it was the release of the defendant on bail pending the second trial which caused the witnesses to disappear. All three had previously expressed fear of defendant.

gan Constitution. Specifically, defendant contends that prosecutorial questioning of witnesses Richard Troher and Wilfred David concerning the fact that Mr. Dye had not told them anything about the incident, and testimony from witnesses Dawson, Stever, Seidel, and Troher that defendant had not accused someone else of the crime was an erroneous comment on defendant's silence.[11] Defendant also contends that testimony of Seidel, David, and Troher that defendant did not go with them to see an attorney and a statement by Troher that Mr. Dye did not go with them when he and David gave a statement to the police were improperly admitted.

To properly understand defendant's claim of error it is helpful to distinguish between prearrest and postarrest conduct. At both trials the defendant suggested that he had intended to contact the police prior to his arrest. He also testified on direct examination by his own counsel that after his arrest he had given a statement to the arson investigator that Stever and Dawson had committed the fire bombing. He added in response to a further question by his counsel in direct examina-

[11] After *People v Collier,* 426 Mich 23; 393 NW2d 346 (1986), it is apparently incorrect to phrase the alleged error as comment on silence. Rather, the inquiry is evidentiary and asks whether the evidence sought to be introduced is relevant, that is whether it makes "the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. See *Collier, supra,* p 36.

Thus, prearrest silence is not to be presumed an exercise of the Fifth Amendment. Where prearrest silence is relevant, as for example where a defendant has made an admission by adoption or manifestation of belief in the statements of others, MRE 801(d)(2)(B), admission of the evidence places no more burden on the defendant's decision to testify than does any other part of the prosecution's proofs. In this case, the defendant, having taken the stand in the first trial and testified concerning his pre- and postarrest conduct, waived any Fifth Amendment claim with regard to use of his prior testimony at the second trial. Absent a showing that prearrest silence constituted an exercise of his constitutional rights, the preliminary admissibility of this evidence is to be resolved at trial by use of the evidentiary rules adopted in *Collier.*

tion, that he had not made a post-arrest statement regarding the homicides on the advice of his attorney. Over counsel's objection, on cross-examination the defendant was asked why, if he was only a material witness in a homicide, he had given a statement accusing Stever and Dawson, but had declined to give a statement regarding the homicide. He indicated that on the advice of counsel he declined to discuss the events surrounding the homicide, but though his counsel had advised against it, he had decided to give the statement to the arson investigator.

Thus, analysis of defendant's argument must begin by identifying two discrete categories of claims, questioning by the prosecution regarding prearrest conduct and questions regarding postarrest silence which were initially brought out by defendant himself.

Error in the context of defendant's prearrest conduct could, under *People v Collier,* 426 Mich 23; 393 NW2d 346 (1986), only be predicated on the basis of relevancy. By contrast, error in the prosecutor's examination regarding postarrest silence, if any, would be predicated upon the rule of *Doyle v Ohio,* 426 US 610; 96 S Ct 2240; 49 L Ed 2d 91 (1976), where the Court held that use of postarrest, post-*Miranda* warning silence for impeachment was "fundamentally unfair and a deprivation of due process . . . ." *Id.* at 618.

A

As to defendant's postarrest silence, that line of questioning was initiated by defense counsel on direct examination of the defendant. As noted by the trial court and the Court of Appeals, once the defendant had testified regarding his decision to speak with the arson investigators, the door had been opened to further inquiry on cross-examina-

tion as to postarrest conduct inconsistent with defendant's other postarrest statement. *People v Gibson,* 71 Mich App 543, 547-548; 248 NW2d 613 (1976). Once defendant raises the issue of postarrest conduct during his direct testimony, he cannot then complain that the prosecutor's cross-examination on this subject was error. In such a context, the impeachment does not amount to use of the defendant's silence in violation of the implied promise of *Miranda* warnings because defendant has not remained silent, but has chosen to speak after having received the warnings. The impeaching inquiry is not an inquiry concerning silence, but an inquiry concerning a postarrest statement.[12]

## B

The line of inquiry regarding the facts of defen-

---

[12] This point was illustrated by the United States Supreme Court in *Anderson v Charles,* 447 US 404; 100 S Ct 2180; 65 L Ed 2d 227 (1980). In that case the defendant was charged with first-degree murder after having been arrested while driving the decedent's automobile and possessing some of his clothes. After receiving *Miranda* warnings, the defendant told the police that he had stolen the car in Ann Arbor near Washtenaw and Hill Streets approximately two miles from the bus station. At trial he testified on direct examination that he had taken the car from the parking lot of the Kelly Tire Company which is next to the bus station and directly across the street from defendant's jail cell window. On cross-examination, the prosecutor asked defendant if he had in fact stolen the car from the Kelly Tire Company parking lot why did he not tell this story to the police at the time of his arrest.

The Court determined that the state's questioning of the defendant concerning this inconsistency did not amount to error under *Doyle v Ohio* because the alleged error was simply inquiry into a prior inconsistent statement. "Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." 447 US 408. Concluding that *Doyle* did not apply in that instance the Court stated that "[e]ach of two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version. But *Doyle* does not require any such formalistic understanding of 'silence,' and we find no reason to adopt such a view in this case." *Id.,* p 409. See also 3 Weinstein, Evidence, ¶ 607[06], p 607-98, n 28.

dant's prearrest conduct was initiated by the pros-
ecution in its case in chief. However, testimony
from Seidel, Dawson, and Stever concerning the
fact that defendant had not accused someone else
of the crime can neither be considered comment
on defendant's prearrest silence nor irrelevant
under the *Collier* analysis. While in the presence
of Seidel, Dawson, and Stever, the defendant had
admitted to the killings in response to a question
by Dawson. In this context, a failure to deny guilt
is not an inquiry concerning silence, but an in-
quiry concerning a prearrest statement. Properly
characterized, the inquiry. is understood as asking
whether defendant had said anything inconsistent
with his admission of guilt, see *United States v
Samples*, 713 F2d 298 (CA 7, 1983).[13]

Likewise questions concerning defendant's fail-
ure to accompany Seidel, Dawson, Stever, Troher
and David when they went to see the lawyer was
not comment on his silence. Defendant testified at
both trials that he had in fact been in contact with
an attorney and that it was he who had set up a
meeting between the attorney and the club mem-
bership:

> It was arranged between me and him [sic], he
> was going to set up a meeting between the homi-
> cide detectives in charge of the case and each and
> each [sic] and every club member to make a state-
> ment to the homicide detectives.

The thrust of defendant's testimony was that his

---

[13] We note that the federal courts hold that the defendant bears the
burden of proving an intent to comment or, alternatively, that the
jury would naturally so construe the prosecutor's inquiry or argu-
ment, *United States v Blankenship*, 746 F2d 233 (CA 5, 1984); *United
States v Riola*, 694 F2d 670 (CA 11, 1983); *Spalla v Foltz*, 788 F2d 400
(CA 6, 1986). Nor can it be said that questions pertaining to defen-
dant's failure to go to the hearing may be characterized as comment
on defendant's silence.

failure to go with his attorney to the police was
only due to the fact that he had been arrested
before such a meeting took place. He further
explained that he had maintained his silence in an
effort to protect Dawson, Stever, Seidel and him-
self.

Significantly, no objection was made by defense
to either line of inquiry, presumably because the
only objection that could have been interposed was
relevancy[14] and defense counsel anticipated that,
as in the first trial, defendant's prearrest contact
with the attorneys would be used affirmatively in
his own defense to buttress his claims that he was
attempting to protect his more culpable friends.

A review of the trial transcript covering the
testimony of Dawson and Seidel clearly indicates
that the defendant intended to use his prearrest
conduct with the attorney to support his claim
that he was not the shooter. Defense counsel did
not object to questions put to Dawson, Seidel, and
Stever. On cross-examination of Dawson and Sei-
del counsel questioned their knowledge of the
defendant's independent contact with the lawyer
on the day after the shootings.[15] This point had *not*

---

[14] Having taken the stand in the first trial and testified to his
prearrest contacts with the attorney, defendant had waived his Fifth
Amendment privilege with regard to such testimony in the second
trial. *Harrison v United States,* 392 US 219; 88 S Ct 2008; 20 L Ed 2d
1047 (1968).

[15] While Seidel indicated that he had no recollection of the defen-
dant having visited the attorney with Stever on Sunday, Dawson,
when questioned by defense counsel stated:

> *Q.* Okay. When you were at Mr. Dye's house for this corn
> roast, you recall a time when he made a phone call to an
> attorney?
> *A.* Yes.
> *Q.* You recall that same night he and Mr. Stever went to
> meet the attorney?
> *A.* Yes.
> *Q.* Okay. Well, now, I thought I understood your direct

been brought out on direct examination and clearly was an attempt to buttress defendant's theory before he took the stand to testify. Defense counsel having developed the theme that it was defendant who had initiated the contact with counsel, it would have been reasonable to expect that if defendant were merely an accessory to the crime, he would have come forward with his version of the incidents, as the others did. Thus, the prosecutor's inquiry to Troher as to whether defendant ever went down to the police station was a question asked to make "less probable," *Collier, supra,* the inference that the defense sought to draw, that prearrest conduct indicated his innocence of the homicides.

C

The opinion for reversal fails to distinguish between the relevancy issue presented by defen-

---

testimony this morning to indicate that you had to keep pushing Mr. Dye, even into Monday night to call an attorney?

*A.* He went to the attorney's house to pick up some club property that had been taken from there.

*Q.* My point, sir, is you just now told us that he called the attorney on Sunday while you were there and he and Mr. Stever went to see the attorney, you were not present?

*A.* No, I wasn't.

*Q.* Okay. I am asking how you kind of reconciled that with your earlier testimony that as late as Monday night you were pushing him to call an attorney?

*A.* To go explain what had happened.

*Q.* But he had already seen the attorney?

*A.* But didn't explain what had happened, to my knowledge.

*Q.* You didn't know?

*A.* To my knowledge.

*Q.* So you really don't know whether that attorney was already working on it?

*A.* No, there is no way I could.

*Q.* Of course not. I am not blaming you for that, but I do think we ought to clear it up.

*A.* Yes.

dant's prearrest conduct and the constitutional question presented by defendant's postarrest silence. The opinion, thus legally and factually confuses the defendant's prearrest failure to accompany Dawson, Stever, and Seidel when they went with their attorneys to the police, with his postarrest refusal to give a statement regarding the homicide. It states:

> Dye on direct examination testified that he did not make a statement to the police because his attorney advised him not to do so. The prosecution asserts that because Dye offered this testimony, the prosecution could have subsequently offered impeaching testimony, and therefore—even if the prosecution improperly included the testimony in its case in chief—any error was harmless. [*Ante*, p 82.]

This statement is incorrect. The prosecution did not make any inquiry in its case in chief regarding Dye's prearrest failure to make a statement, Dye's failure to make a postarrest statement to the homicide investigator, or his postarrest statement to the arson investigators.

When Dye testified on direct examination that he had made a statement to the arson investigators, there may have been an incidental rebuttal effect to any negative inference from his failure to pursue his contact with his attorneys, but its principal purpose was clearly to establish that the firebombing committed by Dawson and Stever was the motivation for the homicides. If the reason for this offering was to rebut evidence that Dye had not gone with the others to make a statement, rebuttal could have been confined to the fact of making a postarrest statement. Instead, for sound strategic reasons, defendant Dye recited the details of his postarrest statement to the arson investiga-

tors, details that served not to explain his silence, but to accuse his accusers.

The defendant's explanation regarding his failure to make a statement concerning the homicides when asked by the arson investigator pertained solely to his postarrest conduct. The prosecutor did not allude to defendant's postarrest conduct at any point in his case in chief.[16] Defendant's failure to make a statement to the homicide investigator was brought out by defense counsel in anticipation of the fact that the prosecutor would, as he did, allude to it during cross-examination.

In sum, defendant's statement that he did not make a statement regarding the homicides was not offered to rebut testimony from Dawson, Stever, and Seidel concerning his prearrest conduct. It was elicited by defense counsel after defendant had testified that he gave a statement incriminating the others in the firebombing in an attempt by

[16] In fact the prosecutor does not argue that because Dye offered this testimony, the prosecution could subsequently have offered impeaching testimony and therefore, even if the prosecution improperly included the testimony in its direct case, because the prosecution could have held the testimony to impeach, any error was harmless.

Rather, the prosecution argues as to prearrest conduct that "the prosecutor did inquire of witness Troher if the defendant ever went down to the police station or if the defendant spoke with the witness about the incident [but that] it was the defense who elicited the fact that Dye did not make any statements to the police," appellee's brief, p 21.

Nor does the prosecutor argue that response to post-arrest silence by the prosecution could be justified as anticipatory impeachment. Rather the prosecution asserts that which the record establishes, viz.,

> that the prosecutor did not elicit any testimony concerning the defendant's post-arrest silence following the giving of *Miranda* rights and the invocation of the right to remain silent . . . . It was the defense who elicited the fact that the defendant was given *Miranda* warnings and that he asserted the right to remain silent upon the advice of counsel . . . the defendant elected to place such evidence before the jury by way of an explanation and cannot now complain if the results were miscalculated. [*Id.,* pp 20-21.]

his own counsel to explain omissions in his postarrest behavior in order to buttress the defendant's testimony that the others were guilty.

D

Finally, with regard to Troher and David, who were not present at the time of the shootings and possessed firsthand knowledge only concerning the murder weapon, defendant argues that questions of these two witnesses regarding whether defendant denied his guilt were irrelevant in that he possessed no duty to disclose to them his knowledge of the crimes, and, given his part in the coverup, it would not have been natural for him to do so. Silence in this instance, the defendant claims, is inherently ambiguous and of little probative value.

For the purpose of deciding the remaining claims of error concerning the testimony of David and Troher, we assume arguendo under *People v Collier, supra,* that the trial judge erred in permitting the prosecutor to question these witnesses concerning defendant's prearrest conduct. We note, however, that defendant did not object to the disputed testimony at trial. In the absence of a timely objection, the issue is deemed waived, and "appellate review is foreclosed unless our failure to consider the issue would result in a miscarriage of justice." *People v Duncan,* 402 Mich 1, 16; 260 NW2d 58 (1977); MCL 769.26; MSA 28.1096. After thorough review of the record, we cannot conclude that a miscarriage of justice would result in this instance.

In *People v Collier,* we held that *People v Bobo,* 390 Mich 355; 212 NW2d 190 (1973), was not applicable to impeachment by silence which occurred before any contact with police officers. We held that, consistent with the Supreme Court's ruling in *Jenkins v Anderson,* 447 US 231; 100 S

Ct 2124; 65 L Ed 2d 86 (1980),[17] the decision to admit prearrest silence is evidentiary, to be resolved by reference to its relevancy and in light of its probativeness as opposed to its potential for prejudice, MRE 403.[18] Assuming arguendo that defendant's failure to deny guilt was not relevant

---

[17] In *Jenkins,* the Court held that a defendant may be impeached with silence where the silence preceded the arrest and the *Miranda* warnings. The Court engaged in a two-step analysis, finding, first, no impermissible burden on a constitutional right, and, second, that the prearrest silence was probative.

The Court concluded that the Fifth Amendment was not burdened by such impeachment of a testifying defendant because the defendant had waived the privilege against self-incrimination by taking the stand. The Court also found that since no governmental action had induced the defendant to remain silent before arrest, the fundamental fairness guarantee of the Fourteenth Amendment was not violated. See also *Fletcher v Weir,* 455 US 603; 102 S Ct 1309; 71 L Ed 2d 490 (1982), and *Anderson v Charles,* 447 US 404; 100 S Ct 2180; 65 L Ed 2d 222 (1980) (due process not violated by impeachment with postarrest, pre-*Miranda* silence).

In this instance, we are not here confronted with a situation in which silence was offered against a nontestifying defendant. Defendant took the stand and waived his Fifth Amendment privilege with respect to the crime charged, anno: *Use in subsequent prosecution of self-incriminating testimony given without invoking privilege,* 5 ALR2d 1404. Once the defendant testified that he had initiated the contact with the attorney and that he would have been willing to make a statement, questions regarding his failure to go to the attorney or to the police would clearly have been permissible on cross-examination under *Jenkins. Jenkins* clearly established that the use of prearrest silence for impeachment purposes does not, in and of itself, violate the federal constitution. See, generally, 1 LaFave & Israel, Criminal Procedure, § 9.6(a), pp 774-775.

As the Court observed in *Fletcher v Weir, supra,* 455 US 604, n 1:

> During cross-examination, the prosecutor also questioned respondent concerning his failure *prior to his arrest* to report the incident to the police and offer his exculpatory story. Relying on our decision in *Jenkins v Anderson* [*supra*], the Court of Appeals correctly held that there was no constitutional impropriety in the prosecutor's use of respondent's prearrest silence for impeachment purposes. [Emphasis in original.]

[18] Our decision in *Collier,* however, dealt only with the use of prearrest silence for impeachment; it was not extended to cover substantive use of such evidence.

evidence, we nevertheless conclude that two references to this fact did not result in a miscarriage of justice. We note that the defendant's silence was consistent with the defense theory of a conspiracy to withhold information from the police. We also note that an eyewitness testified regarding defendant's commission of the murders, that two other witnesses testified that defendant had admitted the killings, and that these comments constituted only two brief references in the course of a trial stretching nearly two weeks and filling over 1300 pages of recorded transcript.[19]

Finally, the lead opinion has concluded that defendant is entitled to a new trial. On retrial, regardless of whether defendant states in limine his intention to testify, two points should be noted. First, as to the retrial the defendant has not yet waived his Fifth Amendment right to remain silent. However, with regard to his prior testimony, having voluntarily chosen to testify at the former trial defendant has waived his Fifth Amendment rights as to such proceeding and objection to use of his former testimony will not lie on that ground.[20]

## CONCLUSION

We would hold that, on the facts of this case, the trial court did not abuse its discretion in finding due diligence in the prosecution's efforts to locate the missing witnesses. We would further hold that

---

[19] Nor can we consider defense counsel's failure to object to this line of questioning tantamount to ineffectiveness of counsel given that the first trial ended with a hung jury. We are convinced that sufficient evidence of record exists apart from the alleged "errors" to support the finding of defendant's guilt beyond a reasonable doubt.

[20] See anno: *Use in subsequent prosecution of self-incriminating testimony given without invoking privilege,* 5 ALR2d 1404. See also *Harrison v United States,* 392 US 219; 88 S Ct 2008; 20 L Ed 2d 1047 (1968).

the evidentiary errors alleged by the defendant did not result in a miscarriage of justice. The decision of the Court of Appeals should be affirmed.

RILEY, C.J., and GRIFFIN, J., concurred with BOYLE, J.