# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

GEORGE ARDELL ALEXANDER,

Defendant-Appellant.

UNPUBLISHED
July 14, 2016

No. 326466
Wayne Circuit Court
LC No. 14-007276-FC

Before: RIORDAN, P.J., and SAAD and M. J. KELLY, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of first-degree felony murder, MCL 750.316(b), and carjacking, MCL 750.529a.[1] He was sentenced, as a fourth habitual offender, MCL 769.12, to life imprisonment without parole for his felony-murder conviction and 40 to 60 years' imprisonment for his carjacking conviction. We affirm.

## I. FACTUAL BACKGROUND

At approximately 1:30 a.m. on August 5, 2014, Robert Gibbs, Tracy Brown, Giovanni Porter, and Albert Johnson were sitting on Gibbs' porch at 9145 Oldtown Street, Detroit, Michigan. At that time, the group was planning to briefly leave Gibbs' residence and drive to a nearby liquor store to get more alcohol before the store closed at 2:00 a.m.

Suddenly, Gibbs, Brown, and Porter saw defendant, who was wearing a brown jogging suit or track suit, sprint around the corner where Gibbs' house was located. Defendant continued to run and cut across Gibbs' yard. It appeared from defendant's clothing that he had been in a fight, as his white T-shirt was "not in place like a normal person" and it had spots of blood on it. Defendant repeatedly asked Johnson to drive him to the "the west side right now," but Johnson refused for money-related reasons and chastised defendant for "whooping and hollering in front of . . . [his] neighbor's home." However, defendant seemed very upset or afraid of something,

---

[1] Defendant also was convicted of second-degree murder, MCL 750.317, but this conviction and sentence were vacated given the trial court's finding that defendant's first-degree felony murder conviction encompasses all of the elements of second-degree murder.

-1-

and it appeared that he was "just trying to get away from that area for some reason[.]" When defendant continued to ask for a ride, Johnson told Gibbs, Brown, and Porter that they should go to the store without him while he tried to calm defendant down, expressing his belief that he could make defendant calm down by the time they returned.

As defendant and Johnson walked toward Johnson's house, Gibbs, Brown, and Porter drove to the liquor store. The trip took approximately 15 minutes. When they returned to Gibbs' residence, they did not see defendant or Johnson. However, Gibbs, Brown, and Porter then heard defendant repeatedly yell, "[T]hey're trying to rob me," as he exited Johnson's house or porch and walked towards Johnson's truck, a burgundy F-150. The only people in the vicinity at that time were Gibbs, Porter, and Brown, and they saw no one else come from the direction of Johnson's home or run away from the scene.

Defendant attempted to start Johnson's truck with the automatic car starter remote, while continuing to state that "they" were trying to rob him. He ultimately entered and started defendant's truck. This concerned Gibbs, Porter, and Brown because Johnson never let anyone hold his car keys unless he was present and never allowed anyone else to drive his truck.

Gibbs ran inside his house, grabbed an axe, and ran toward the truck—which, at that point, was backing down the driveway—in an attempt to prevent defendant from taking it. Defendant shifted the truck into drive while it was halfway in the street and halfway on the sidewalk and grass. He then attempted to run over Gibbs and Brown by driving toward them while revving the engine. Gibbs and Brown jumped out of the way, and defendant drove over the neighbor's grass and onto the street, turning onto the service drive and entering westbound I-94.

After defendant left, Gibbs and Brown saw Johnson lying on his porch steps and realized that he was dead. Gibbs saw a little bit of blood in Johnson's mouth and a small gash on the top of his head.

The police arrived several minutes later. Based on the condition of the porch and the front bedroom inside Johnson's residence, the police believed that "a struggle" had ensued on the porch and "a ruckus" had occurred in the bedroom. Several items and blood samples were collected and sent to the Michigan State Police Crime Laboratory for DNA testing.

Katrina Johnson lived next door to defendant's sister, Monica, on Ford Street on the west side of Detroit. In the early morning hours of August 5, 2014, she had just returned home from work when she "heard a big bang" that "almost sounded like a car crash." She looked out the window and saw a burgundy F-150 truck. The truck had driven into a hole in the street and struck a blue Suburban that was parked in front of the hole. Katrina then saw defendant, who was wearing a brown hooded jogging suit, exit the vehicle. Defendant walked between Katrina's house and the home of her other neighbor, Sunny Willingham, and attempted to jump over Willingham's gate. Defendant was unable to do so, and the gate "made a lot of noise." Next, defendant quickly walked in front of Katrina's house, going to his sister's house on the other side. As defendant walked by within inches of Katrina's open window, defendant and Katrina gestured in acknowledgement of each other.

-2-

At approximately 7:00 a.m., defendant's sister, Monica, knocked on Katrina's door. When Monica sat down with Katrina and Katrina's aunt, she immediately told them that "her brother had just killed someone[.]" When Katrina asked Monica if she was sure, Monica responded that "she was very sure" and provided the following description of the crime to Katrina:

> She said her brother was on the east side. She didn't give an exact location, [stating] that somebody that he was acquainted with he had murdered and took his vehicle and I said, well, what kind of vehicle was it? I saw your brother just a few hours ago. She said, it's a F-150, and I said, I saw him, you know, in the vehicle, which was prior, maybe four hours prior and she said, yeah, we had to pull the vehicle around the corner and I left the keys on the dashboard.

Additionally, Monica told Katrina that she had defendant's clothing in the shopping bag and she intended to wash the clothes.

Katrina left while Monica was still at her house. Based on the information from Monica, Katrina first went to see if the F-150 was still parked in the same place that she had seen it on her street and discovered that it was not. It was parked one block away near the corner of LaBelle and LaSalle, as Monica had indicated. Katrina immediately went to the police to report her findings.

Later in the morning on August 5, 2014, defendant was arrested after he surrendered to the police. The arrest occurred after he emerged from 2446 Ford Street, Detroit Michigan, while wearing a brown track suit.[2]

Dr. Chantel Njiwaji, a doctor of forensic pathology employed by the Wayne County Medical Examiner's Office, performed an autopsy on Johnson's body. She classified Johnson's death as a homicide and was able to determine that "[t]he cause of death was blunt chest trauma and manual strangulation," although either of those causes were sufficient on their own to cause Johnson's death. She could not determine which injury occurred first and identified a variety of injuries on the inside and outside of his body.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that the prosecution presented insufficient evidence at trial to support his carjacking and first-degree felony-murder convictions. We disagree.

## A. STANDARD OF REVIEW

This Court reviews a challenge to the sufficiency of the evidence *de novo*. *People v Henderson*, 306 Mich App 1, 8-9; 854 NW2d 234 (2014). "We examine the evidence in a light

---

[2] Defendant's sister, Monica, lived in the lower flat at that address, and his girlfriend, Latrice Neal, lived in the upper flat.

most favorable to the prosecution, resolving all evidentiary conflicts in its favor, and determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond reasonable doubt." *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013) (quotation marks and citation omitted). "Circumstantial evidence and reasonable inferences arising [from the evidence] may constitute proof of the elements of [a] crime." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). This Court's review is deferential, as "[w]hen assessing a challenge to the sufficiency of evidence, the trier of fact, not the appellate court, determines what inferences may be fairly drawn from the evidence and the weight to be accorded those inferences." *People v Malone*, 287 Mich App 648, 654; 792 NW2d 7 (2010), overruled in part on other grounds by *People v Jackson*, 498 Mich 246, 268 n 9 (2015). See also *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

## B. ANALYSIS

Defendant argues that his "conviction cannot be sustained because the complainants were not 'present' in or near the vehicle when he took it, within the clear language and intent of the statute." In making this claim, defendant relies on two cases that interpreted a former version of the carjacking statute, which previously provided that in order for a defendant's conduct to constitute carjacking, the defendant must rob, steal, or take a motor vehicle "from another person, in the presence of that person or the presence of a passenger or in the presence of any other person in lawful possession of the motor vehicle . . . ." See *People v Raper*, 222 Mich App 475, 482; 563 NW2d 709 (1997); *People v Green*, 228 Mich App 684, 694-696; 580 NW2d 444 (1998) (both quoting a former version of MCL 750.529a). The carjacking statute was amended by 2004 PA 128, effective July 1, 2004. The current version of the statute does not include language requiring that the crime occur "in the presence" of a person specified in the statute. Rather, the current version of the statute includes the following elements:

> A carjacking occurs in the course of committing a larceny of a motor vehicle[.] While doing so, a defendant must use (1) force or violence, (2) the threat of force or violence, or (3) put in fear any operator, passenger, or person in lawful possession of the motor vehicle, or any person lawfully attempting to recover the motor vehicle. [*People v Hardy*, 494 Mich 430, 444; 835 NW2d 340 (2013) (quotation marks and footnotes omitted; alteration in original), citing MCL 750.529a(1).]

We reject defendant's claim based on the "presence" requirement under the former version of the statute. Nevertheless, even if we assume, arguendo, the statute still encompasses a "presence" requirement, the jury could reasonably infer—given the fact that Johnson was found dead on his front porch steps at the time that the truck was taken from the driveway in front of his home—that Johnson was in the presence of the vehicle when it was taken, as that phrase was construed under the former version of the statute. See *Green*, 228 Mich App at 695-696; *Bennett*, 290 Mich App at 472.

The only other element contested by defendant is the force or fear element. He argues that there was no evidence presented at trial that he used force or violence, or that he threatened Johnson with force or violence. He asserts, "Although there was evidence that [Johnson] was choked, this is no evidence that the two events were directly related." Contrary to defendant's

claims, the prosecution presented clear evidence from which the jury could infer that defendant used force or violence to commit a larceny of Johnson's vehicle. See *Nowack*, 462 Mich at 400.

The record shows that Johnson underwent serious injury causing death, consisting of blunt chest trauma, manual strangulation, and blunt force injuries to his face. It is clear that these injuries occurred within minutes before defendant drove away in Johnson's car, as Gibbs, Brown, and Porter each testified that (1) they saw defendant walk with Johnson toward Johnson's house immediately before they left for the liquor store, (2) their trip to the liquor store only lasted 15-20 minutes, and (3) they saw defendant taking Johnson's truck with Johnson's car keys—and found Johnson dead on the porch—when they returned from the store. Additionally, there was evidence that a struggle occurred on Johnson's front porch, which was the location where Johnson's body was found and where defendant was last seen before entering Johnson's truck. Moreover, Gibbs, Porter, and Brown consistently testified that Johnson never let anyone drive his truck, never let anyone else hold his car keys unless he was present, and made "everybody" aware of that fact. Under these circumstances, the jury could reasonably infer that Johnson's injuries and death were a direct result of defendant's use of force or violence in order to take Johnson's truck, especially given the fact that Johnson never allowed anyone else to drive his truck. Further, defendant's sister, in an excited utterance, told Katrina when she arrived at Katrina's house at 7:00 a.m. the following morning that defendant told her that he had murdered an acquaintance and taken his F-150. Therefore, when viewed in the light most favorable to the prosecution, sufficient circumstantial evidence was presented at trial to support defendant's carjacking conviction. See *Hardy*, 494 Mich at 444; *Bennett*, 290 Mich App at 472.

We also reject defendant's claim, with regard to his felony-murder conviction, that the prosecution presented insufficient evidence from which a reasonable jury could conclude that Johnson's death occurred during the perpetration or attempted perpetration of a larceny or carjacking. See *People v Lane*, 308 Mich App 38, 57-58; 862 NW2d 446 (2014) ("The elements of [first-degree] felony murder are (1) the killing of a person, (2) with the intent to kill, do great bodily harm, or create a high risk of death or great bodily harm with the knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of an enumerated felony."). "Because the intent to commit the enumerated felony . . . [is] an element of the crime of felony murder, the prosecution had to produce some evidence with regard to this element or evidence from which this element could be inferred." *People v Brannon*, 194 Mich App 121, 125; 486 NW2d 83 (1992).

From the same facts described *supra*, especially when considered in conjunction with defendant's repeated requests that Johnson drive him to the west side of the city, and the fact that defendant ultimately arrived with Johnson's truck on the west side, a jury could reasonably infer that defendant intended to commit the enumerated felony of carjacking when he murdered Johnson. Moreover, defendant's intent to commit the underlying felony can be further inferred from the fact that defendant continued to drive away in Johnson's vehicle after Gibbs tried to stop him. See *Bennett*, 290 Mich App at 472. Therefore, there was sufficient circumstantial evidence presented at trial linking Johnson's death to the commission of the carjacking to support defendant's first-degree felony-murder conviction. See *id*.; see also *Nowack*, 462 Mich at 400.

### III. MOTION FOR MISTRIAL

Next, defendant argues that the trial court erred in denying his motion for a mistrial after Detroit Police Investigator Charles Weaver, the officer in charge, stated that defendant was unable to provide any information regarding the incident that occurred at the location of the carjacking and homicide. We disagree.

## A. STANDARD OF REVIEW

We review for an abuse of discretion a trial court's decision regarding a motion for a mistrial. This Court will find an abuse of discretion if the trial court chose an outcome that is outside the range of principled outcomes. A trial court should grant a mistrial only for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial. [*People v Schaw*, 288 Mich App 231, 236; 791 NW2d 743 (2010) (quotation marks and citations omitted).]

## B. ANALYSIS

Defendant argues that Weaver's comments were improper, violated his Fifth Amendment right to remain silent, and were "severely prejudicial." In particular, defendant contends that Weaver's statements were improper because Weaver "was not allowed to disclose to the jury that [defendant] had exercised his constitutional rights" by "refus[ing] to answer the investigator's questions." However, in making this claim, defendant mischaracterizes his interview with Weaver as well as Weaver's testimony at trial.

"No person . . . shall be compelled in any criminal case to be a witness against himself." US Const, Am V. This constitutional guarantee applies to the states through the Due Process Clause of the Fourteenth Amendment. US Const, Am XIV. See also Const 1963, art 1, § 17 ("No person shall be compelled in any criminal case to be a witness against himself . . . ."). When a defendant exercises his right to remain silent, that silence may not be used against him at trial in most instances. *People v Shafier*, 483 Mich 205, 212-213; 768 NW2d 305, 310 (2009), cert den *Michigan v Shafier*, 558 US 992; 130 S Ct 509; 175 L Ed 2d 349 (2009), citing *Wainwright v Greenfield*, 474 US 284, 290-291; 106 S Ct 634; 88 L Ed 2d 623 (1986), and *Doyle v Ohio,* 426 US 610, 618-620; 96 S Ct 2240; 49 L Ed 2d 91 (1976); *People v Taylor*, 245 Mich App 293, 304; 628 NW2d 55 (2001).

Here, there is no dispute that defendant waived his *Miranda* rights and voluntarily spoke with Investigator Weaver for a period of time. Although he subsequently invoked his Fifth Amendment right to remain silent, this fact was never presented to the jury. Rather, Weaver only stated defendant "could not provide any information" about an incident that occurred at the crime scene. Weaver made no mention of defendant's subsequent invocation of his right to remain silent. Further, even if Weaver's statement did constitute a comment on defendant's silence, the prosecutor did not elicit the comment. Weaver, without any prompting, mentioned defendant's inability to provide information while Weaver described the course of his investigation. See *Taylor*, 245 Mich App at 304 ("Here, . . . the arresting officer's testimony regarding defendant's silence was unsolicited and provided no unique information regarding defendant's guilt or innocence.").

In addition, the prosecutor's subsequent examination of Weaver clarified that (1) Weaver spoke with defendant following his arrest, (2) Weaver had advised defendant of his constitutional rights, (3) defendant indicated that he would speak with Weaver, (4) defendant stated that he could not remember doing anything at 9159 Oldtown, and (5) the "lengthy" interview ceased at some point after defendant denied remembering that he did anything at 9159 Oldtown. Again, through these statements, Weaver did not comment on defendant's invocation of his right to remain silent, and defendant's silence was not used as evidence of substantive guilt or impeachment.

Likewise, the prosecution's reference, during its rebuttal argument, to defendant's statements to Investigator Weaver were consistent with Weaver's testimony, *i.e.*, during the interview, defendant said he did not remember what had happened, and defendant did not provide information regarding an alleged robbery that resulted in Johnson's death. The prosecution's statement was not an improper comment on defendant's silence. Finally, contrary to defendant's claims, nothing in Weaver's statements provided a basis for the jury to infer that defendant was guilty based on the fact that he refused, at some point, to speak to the police, as the facts presented to the jury clearly established that defendant did, in fact, speak with the police.

Thus, defendant's due process rights were not violated, and the trial court's denial of defendant's motion for a mistrial was not outside the range of principled outcomes. See *Schaw*, 288 Mich App at 236.

## IV. ADMISSION OF EXCITED UTTERANCES UNDER MRE 803(2)

Defendant argues that the trial court abused its discretion when it admitted Monica's statements to Katrina as excited utterances. We disagree.

### A. STANDARD OF REVIEW

"The decision whether to admit evidence is within the discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion." *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008).

### B. ANALYSIS

MRE 801(c) defines "hearsay" as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pursuant to MRE 802, hearsay is not admissible unless it falls under one of the exceptions to the hearsay rule provided by the Michigan Rules of Evidence. Two requirements must be met for an out-of-court statement to qualify under the excited utterance exception pursuant to MRE 803(2): (1) a startling event occurred, and (2) the resulting statement was made while the declarant was under the stress of excitement instigated by the event. *People v Smith*, 456 Mich 543, 550; 581 NW2d 654 (1998).

Here, defendant does not contest the fact that a startling even occurred. He only challenges (1) the trial court's determination that Monica made the statements while she was still under the stress of excitement and (2) the overall trustworthiness of Monica's statements. He exclusively focuses on (1) the length of time between defendant's arrival at the duplex occupied by his sister and girlfriend and Monica's statements to Katrina and (2) "the complete lack of corroboration" because of Monica's absence from the trial.

A trial court is afforded wide discretion in determining whether a declarant was still under the stress of an event when he or she made a statement. *Id*. at 552. The focus of a court's inquiry regarding whether a statement was made while the declarant was under the stress of excitement instigated by the event is on the declarant's lack of capacity to fabricate, not the lack of time to fabricate. *Id*. at 551. "Though the time that passes between the event and the statement is an important factor to be considered in determining whether the declarant was still under the stress of the event when the statement was made, it is not dispositive." *Id*.

Contrary to defendant's claims, the record supports the trial court's findings that Monica's statements were made while she was still under the stress of the event and, therefore, that her statements were reliable and trustworthy. Katrina testified that Monica knocked on her door at approximately 7:00 a.m. and asked if the household had any coffee after Katrina had seen defendant go to Monica's house at approximately 2:00 or 2:30 a.m. Monica appeared "somewhat excited," as she was moving quickly, talking rapidly, and "show[ing] excitement in her personality." Katrina later characterized Monica's demeanor as "excited or riled up[.]" Katrina testified that this behavior was uncharacteristic of Monica, as she was often under the influence of prescription medication and, as a result, usually spoke and moved at a much slower pace. In response to Monica's request, Katrina "sat her down" and "made her a cup of coffee." When Katrina returned from the kitchen and sat down at the dining room table, where Monica and Katrina's aunt were sitting, Monica immediately told them that defendant had killed someone, that she had defendant's clothes in a bag, and that defendant had taken that man's F-150. Following these initial statements, Monica further discussed her knowledge of the crime.

Given Katrina's familiarity with Monica's usual demeanor and the undisputed fact that Monica's statements constituted highly incriminating statements regarding her own brother, one could reasonably infer that Monica's statements were made out of a continuing state of emotional shock precipitated by defendant's arrival and confession, and that she made these declarations while lacking the capacity to fabricate the statements, even though four to five hours had passed since Katrina saw defendant arrive at the duplex. See *Smith* 456 Mich at 551. Notably, though, it appears from Katrina's testimony that Monica never told her the exact time when she discovered that defendant had arrived, or when defendant confessed his criminal acts to her. Rather, even though Katrina's own observations indicated that hours passed between defendant's arrival on Ford Street and the time at which Monica came to Katrina's house, three circumstances suggest that the startling event continued for a significant period of time, or that a shorter period of time passed between the startling event and Monica's statements to Katrina. First, Monica stated that her "brother *just* killed somebody." (Emphasis added). Next, Monica described her actions after defendant told her about the homicide and carjacking, which included moving the truck to a different location. Third, Monica stated that she was carrying defendant's clothes when she came to Katrina's house. See *id*. ("Though the time that passes between the event and the statement is an important factor to be considered in determining whether the

-8-

declarant was still under the stress of the event when the statement was made, it is not dispositive. It is necessary to consider whether there was a plausible explanation for the delay.").

Further, the fact that Monica did not testify at trial and "corroborate" the statement that she previously made to Katrina is not relevant to whether Monica's statement was admissible as an excited utterance. See MRE 803(2); *People v Barrett*, 480 Mich 125, 130-138; 747 NW2d 797 (2008); *Smith*, 456 Mich at 550-555. Defendant has not identified any authority indicating that a court should consider whether the declarant testified at trial and corroborated her out-of-court statement, and we have found none.

Therefore, especially given the "wide discretion" possessed by the trial court, see *Smith*, 456 Mich at 551, the trial court did not abuse its discretion when it concluded that Monica made the statement while under the stress of excitement from defendant's confession and admitted her statements as excited utterances, see *Unger*, 278 Mich App at 217.

## V. ADMISSION OF PRELIMINARY EXAMINATION TESTIMONY UNDER MRE 804(b)(1)

Defendant contests the trial court's finding that the prosecution exercised due diligence to locate missing witness Latrice Neal and the admission of Neal's preliminary examination testimony. We reject defendant's claims.

### A. STANDARD OF REVIEW

A trial court's determination regarding whether the prosecution exercised due diligence is reviewed for an abuse of discretion. *People v Bean*, 457 Mich 677, 684-685; 580 NW2d 390 (1998); *People v Eccles*, 260 Mich App 379, 389; 677 NW2d 76 (2004). However, factual findings underlying the trial court's due diligence determination will not be reversed unless they are clearly erroneous. *People v Lawton*, 196 Mich App 341, 348; 492 NW2d 810 (1992); see also *People v Briseno*, 211 Mich App 11, 14; 535 NW2d 559 (1995), citing MCR 2.613.

### B. ANALYSIS

In a criminal prosecution, the defendant has a constitutional right "to be confronted with the witnesses against him." US Const, Am VI; Const 1963, art 1, § 20; *Bean*, 457 Mich at 682. "The right of confrontation insures that the witness testifies under oath at trial, is available for cross-examination, and allows the jury to observe the demeanor of the witness." *People v Yost*, 278 Mich App 341, 370; 749 NW2d 753 (2008) (quotation marks and citation omitted). However, a trial court may admit former testimony "at trial under both MRE 804(b)(1) and the Confrontation Clause as long as the witness is unavailable for trial[3] and was subject to cross-

---

[3] MRE 804(a) provides, in relevant part, that a declarant is unavailable for purposes of MRE 804(b)(1) when the declarant "is absent from the hearing and the proponent of [her] statement has been unable to procure the declarant's attendance . . . by process or other reasonable means, and in a criminal case, due diligence is shown." MRE 804(a)(5).

examination during the prior testimony." *People v Garland*, 286 Mich App 1, 7; 777 NW2d 732 (2009), citing *Crawford v Washington*, 541 US 36; 124 S Ct 1354; 158 L Ed 2d 177 (2004). Accordingly, even though, as defendant emphasizes, "[d]emeanor evidence is important," *People v Dye*, 431 Mich 58, 64; 427 NW2d 501 (1988), the substantive use of preliminary examination testimony at trial does not violate a criminal defendant's right of confrontation if the prosecution exercised due diligence to produce the absent witness and the testimony includes satisfactory indicia of reliability, *Bean*, 457 Mich at 682-683, citing MCL 768.26, MRE 804(a)(5), and MRE 804(b)(1).

Here, defendant only contests whether the prosecution exercised due diligence to produce Neal. "The test is one of reasonableness and depends on the facts and circumstances of each case, i.e., whether diligent good-faith efforts were made to procure the testimony, not whether more stringent efforts would have produced it." *Bean*, 457 Mich at 684; see also *People v James*, 192 Mich App 568, 571; 481 NW2d 715 (1992).

As the trial court concluded, the uncontested efforts in this case constitute due diligence. During the midtrial hearing, Investigator Weaver testified that Neal was transported by the police to the preliminary examination, at which time she indicated her reluctance to be a witness. Despite her stated reluctance, however, Weaver experienced no difficulty in securing her presence at the preliminary examination. Likewise, Weaver encountered no issues in locating her address and personally serving her with a subpoena, and she provided no indication that she intended to move away from her residence on Ford Street. Accordingly, Investigator Weaver had no reason to believe that it would be difficult to secure her presence at trial. As such, this case is distinct from cases where the police and prosecution were aware that a witness may not appear at trial because he had known reasons to avoid police detection or incentives to go into hiding. Cf. *Dye*, 431 Mich at 67-68, 76; *People v Watkins*, 209 Mich App 1, 4; 530 NW2d 111 (1995) (noting that the record included no indication that the prosecution experienced difficulties in producing an unavailable witness for the defendant's first trial).

Although Investigator Weaver did not have any contact with Neal or her immediate family after the preliminary examination, only four months passed between August 21, 2014, the date of the preliminary examination, and the time at which Investigator Weaver received the first set of subpoenas for defendant's trial. Investigator Weaver testified that he continuously looked for Neal without any success from approximately December 15, 2014, through February 10, 2015.[4]

In December 2014 and January 2014, Investigator Weaver visited Neal's former address on Ford Street approximately three times until he was informed by Monica, who lived below Neal, that Neal no longer lived in the upper flat. Monica was unable to provide any information regarding Neal's whereabouts. Although Weaver had a working phone number for Neal at the beginning of the case, it was no longer in service as he searched for her before trial.

---

[4] Defendant's trial was originally scheduled to begin on January 12, 2015, but it actually began on January 27, 2015.

Weaver then accessed Accurint and Talon, two computer databases that provide the names of family members, addresses, social security numbers, and phone numbers associated with an individual, in an attempt to locate Neal. Through his searches, he found two addresses associated with the name "Latrice Neal." When Weaver visited one of these addresses before trial, located on Glendale Street in Detroit, Michigan, he discovered that it was a vacant residence that had no windows, no doors, no occupants, and no working utilities.[5] Police visited the second address, located in Auburn Hills, Michigan, on at least two occasions after January 12, 2015. When Investigator Weaver visited the residence himself, he left a subpoena and his contact information. He also called the phone number provided for the woman named Latrice Neal who lived there on multiple occasions. Ultimately, after receiving the assistance of the Auburn Hills police during trial, the prosecutor and Investigator Weaver confirmed that the "Latrice Neal" who lived at the Auburn Hills address was not the same Latrice Neal who previously lived on Ford Street in Detroit, as the women had different birthdates and social security numbers, and Weaver confirmed that they were different people after viewing a photograph provided by the Auburn Hills police.

During the course of the trial, Investigator Weaver performed "additional Accurint research," which produced two additional addresses in Detroit. Both locations were vacant lots.

The police successfully contacted Neal's mother, Gail Dent-Edwards, while she was at Henry Ford Hospital. Dent-Edwards did not provide any information regarding Neal's location or any contact information, but she indicated that she would ask Neal to contact the police. Later, the police were unable to serve Dent-Edwards with a subpoena because she had been discharged, and the hospital would not provide her current address. Dent-Edwards did not answer the phone when the police attempted to call the number that she provided to Officer Patrick Lane, and Investigator Weaver was unable to determine Dent-Edwards' whereabouts.

When Weaver called another potential telephone number for Neal, there was no answer. However, when Officer Lane called, someone answered, stated that she was "Latrice Neal," but denied that she had lived at 2446 Ford. The woman also stated that she did not know defendant.

Weaver also was unable to locate a current address, photo, or any other helpful information concerning Neal through the Law Enforcement Information Network ("LEIN"). He contacted the Department of Agriculture to determine if Neal had been issued a bridge card and learned that she had, but it was registered to the vacant address on Glendale in Detroit. He also contacted the U.S. Postal Service, but he had not received a response at the time of the due diligence hearing. Moreover, Weaver also checked area hospitals and as well as jails and prisons in Oakland, Wayne, and Macomb Counties without success.

Defendant argues that "[t]here was absolutely no evidence of any significant effort to timely meet the strict standard of due diligence" in this case. He relies on *Dye*, 431 Mich 58,

---

[5] Weaver requested assistance from the Detroit Fugitive Apprehension Team ("DFAT") after a material witness detainer was issued. Detroit Police Officer Darell Fitzgerald pursued the same avenues as Weaver without success.

*Bean*, 457 Mich 677, and *James*, 192 Mich App 568, in arguing that the prosecution's efforts were untimely and insufficient in light of Neal's reluctance to testify. However, it is apparent that the prosecution exercised due diligence in this case, even though the officer in charge did not attempt to locate and serve Neal until a few weeks before trial. Again, unlike in *Dye*, 431 Mich at 67-68, 76—where the witnesses had been difficult to locate for the defendant's first trial, the witnesses had a variety to reasons to go into hiding, and the witnesses expressed an intent to leave the state—the prosecution had no trouble producing Neal for the preliminary examination just four months earlier; Neal only indicated a reluctance to testify, not an intention to flee or evade service; and Neal never expressed any intention of moving. See *Watkins*, 209 Mich App at 4; *People v Conner*, 182 Mich App 674, 682; 452 NW2d 877 (1990). Likewise, as the trial court emphasized, this case is distinct from *James*, 192 Mich App at 571-573, where efforts to locate the witness were not made until the first day of trial when the witness failed to appear, despite the fact that the prosecutor had no contact with the witness for nearly 3½ years between the preliminary examination and the trial. Further, in *James*, the only additional efforts made by the prosecution were phone calls placed over the weekend after the trial had begun. *Id*. at 572. Here, the police and prosecution made extensive efforts both before and during trial.

The efforts in this case were much more significant than those in *Bean*, 457 Mich at 689-690, and they were reasonable under the circumstances. Unlike in *Bean*, the police and prosecution in this case pursued a wide variety of local avenues in an attempt to locate Neal, cf. *id*. at 689, citing *Dye*, 431 Mich at 67-73; they never discovered any information confirming the address or general location where Neal had moved, cf. *Bean*, 457 Mich at 689-690; *Dye*, 431 Mich at 69-72; and, ultimately, they requested the assistance of the Auburn Hills police in order to confirm that the Latrice Neal living at the only remaining viable address was a different woman. There is no indication that the prosecution and police in this case failed to investigate any addresses, phone numbers, or potential leads. See *Conner*, 182 Mich App at 681 ("The Michigan Supreme Court has indicated that, where there are no leads as to the witness'[s] whereabouts, the prosecutor should inquire of known persons who might reasonably be expected to have information that would help locate the witness. Where there are specific leads as to the witness'[s] location, the prosecutor must pursue them."), citing *People v McIntosh*, 389 Mich 82, 87; 204 NW2d 135 (1973).

The test is whether diligent good-faith efforts were made, not whether more stringent efforts could have produced Neal at trial. *Bean*, 457 Mich at 684; *James*, 192 Mich App at 571. Even so, there is no indication that earlier or more stringent efforts could have resulted in securing Neal's presence at trial in this case. Defendant has failed to demonstrate a clear abuse of discretion in the trial court's finding of due diligence. See *Bean*, 457 Mich at 684-685; *Lawton*, 196 Mich App at 348.

## VI. PROSECUTORIAL MISCONDUCT

Next, defendant argues that he is entitled to a new trial based on two statements made by the prosecutor during his closing argument. We disagree.

## A. STANDARD OF REVIEW

Defendant failed to preserve his claims of prosecutorial misconduct by "contemporaneously object[ing] and request[ing] a curative instruction." *Bennett*, 290 Mich App at 475. Thus, we review defendant's unpreserved claims for plain error affecting substantial rights. *Id*. at 475-476, citing *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To demonstrate such an error, the defendant must show that (1) an error occurred, (2) the error was clear or obvious, and (3) "the plain error affected [the defendant's] substantial rights," which "generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Carines*, 460 Mich at 763. "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings. Further, [this Court] cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *Bennett*, 290 Mich App at 476 (quotation marks and citations omitted; alteration in original). See also *Unger*, 278 Mich App at 234-235 ("Review of alleged prosecutorial misconduct is precluded unless the defendant timely and specifically objects, except when an objection could not have cured the error, or a failure to review the issue would result in a miscarriage of justice.").

We review prosecutorial misconduct claims on a case-by-case basis, examining the prosecutor's remarks in context. *People v Mann*, 288 Mich App 114, 119; 792 NW2d 53 (2010); *People v Dobek*, 274 Mich App 58, 63-64; 732 NW2d 546 (2007). "The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial." *People v Brown*, 294 Mich App 377, 382; 811 NW2d 531 (2011).

## B. ANALYSIS

### 1. REFERENCE TO ADDITIONAL STABBING

Defendant argues that the prosecutor improperly suggested during his closing argument that defendant stabbed someone else in addition to strangling Johnson. We disagree.

"A prosecutor may not make a factual statement to the jury that is not supported by the evidence, but he or she is free to argue the evidence and all reasonable inferences arising from it as they relate to his or her theory of the case." *Dobek*, 274 Mich App at 66. Notably, "[t]he prosecution has wide latitude in arguing the facts and reasonable inferences, and need not confine argument to the blandest possible terms." *Id*.

The prosecutor's statements were consistent with the evidence presented at trial or reasonable inferences from that evidence. Neal testified that defendant told her that "that he had got into it with somebody and choked him out in the bathroom."[6] Defendant also told Neal that "he stabbed him," and Neal believed that defendant was referring to two different people. Likewise, the medical examiner found no evidence during the autopsy that Johnson had been stabbed. Additionally, Amy Altesleben, a forensic scientist who performed the DNA testing in this case, testified that Johnson and defendant were "excluded as possible donors to the DNA

---

[6] As discussed above, Neal's testimony was properly admitted, despite defendant's claims.

profile from the items labeled as the possible bloodstain from the sidewalk and the possible bloodstain from the knife blade," but all of the blood samples were from the same male contributor, who was unknown.

Accordingly, it is clear that the prosecutor's argument that defendant stabbed another unknown individual was supported by evidence admitted at trial and was not, as defendant argues, "unfounded innuendo." See *Dobek*, 274 Mich App at 66. Defendant has failed to establish plain error affecting his substantial rights. See *Bennett*, 290 Mich App at 475-476.[7]

## 2. PROSECUTOR'S ALLEGED APPEAL TO SYMPATHY FOR JOHNSON

Defendant also argues that the prosecutor violated defendant's due process rights when he stated, "Mr. Johnson isn't here to tell us exactly what happened." Defendant argues that through this statement, "the prosecutor successfully injected unfounded and unfairly prejudicial innuendo into the proceedings . . . which was designed to appeal to the jury's sympathy and shift the focus of the jury's sworn responsibility[.]"

Defendant is correct that "[a]ppeals to the jury to sympathize with the victim constitute improper argument." *People v Watson*, 245 Mich App 572, 591; 629 NW2d 411 (2001). See also *Lane*, 308 Mich App at 66 ("The prosecutor commits misconduct when he or she invites jurors to suspend their powers of judgment and decide the case on the basis of sympathy or civic duty."). However, despite defendant's characterization of the prosecutor's statement, it was not a "blatant attempt to evoke juror sympathy." Defendant primarily relies on *People v Dalessandro*, 165 Mich App 569, 581; 419 NW2d 609 (1988), in which this Court held, "By constantly referring to 'the poor innocent baby,' the prosecutor was injecting the element of sympathy for William into the case. While the prosecutor did not specifically state that the jury should sympathize with William, the prosecutor's statements were obviously intended to elicit just that emotional response." However, in this case, as in *Watson*, the prosecutor's comment regarding Johnson's absence was isolated, it was not a blatant appeal to the jury's sympathy, and "it was not so inflammatory as to prejudice defendant." *Watson*, 245 Mich App at 591. Rather, when viewed in context, it is apparent that the prosecutor's comment specifically *directed the jury's attention to the evidence* presented in this case concerning Johnson's death, which was

---

[7] To the extent that defendant argues that the prosecutor's comments constituted a violation of MRE 404(b), such a claim has no merit. The prosecutor's comment did not constitute other-acts evidence, and the trial court properly instructed the jury that the attorneys' arguments were not evidence. See *People v Gaines*, 306 Mich App 289, 309; 856 NW2d 222 (2014). "[J]urors are presumed to follow their instructions." *People v Waclawski*, 286 Mich App 634, 674; 780 NW2d 321 (2009) (quotation marks and citation omitted).

Further, defendant does not argue on appeal that the evidence to which the prosecutor referred was improperly admitted under MRE 404(b). To the extent that he intended to raise such a claim, we deem it abandoned. See MCR 7.212(C)(5); *People v McMiller*, 202 Mich App 82, 83 n 1; 507 NW2d 812 (1993); *People v Bosca*, 310 Mich App 1, 48; 871 NW2d 307 (2015), appeal held in abeyance 872 NW2d 492 (2015).

-14-

exclusively circumstantial given that fact that Johnson, the only other individual known to be present while defendant committed the crime, was not available at trial to testify regarding the specific facts of his own homicide. See *Lane*, 308 Mich App at 66 (finding no plain error when the prosecutor urged the jury to find the defendant guilty based on the evidence presented and its sense of judgment). Further, the trial court instructed the jury that it must "return a true and just verdict based only on the evidence and my instructions on the law. You must not let sympathy or prejudice influence your decision." "[J]urors are presumed to follow their instructions." *People v Waclawski*, 286 Mich App 634, 674; 780 NW2d 321 (2009).

Accordingly, there is no basis for concluding that the prosecutor's comment was a plain error affecting defendant's substantial rights. See *Bennett*, 290 Mich App at 475-476.

## VII. DURESS INSTRUCTION

Lastly, defendant argues that the trial court erred in denying his request for a jury instruction on duress. We disagree.

## A. STANDARD OF REVIEW

We review *de novo* questions of law pertaining to jury instructions, but we review for an abuse of discretion a trial court's decision regarding whether an instruction is applicable to the facts of the case. *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006).

> A defendant in a criminal trial is entitled to have a properly instructed jury consider the evidence against him or her. The trial court's role is to clearly present the case to the jury and to instruct it on the applicable law. Jury instructions must include all the elements of the offenses charged against the defendant and any material issues, defenses, and theories that are supported by the evidence. Jury instructions are reviewed in their entirety, and there is no error requiring reversal if the instructions sufficiently protected the rights of the defendant and fairly presented the triable issues to the jury. [*Dobek*, 274 Mich App at 82 (citations omitted).]

## B. ANALYSIS

> Duress is a common-law affirmative defense. To be entitled to an instruction on an affirmative defense, such as duress, a defendant asserting the defense must produce some evidence from which the jury can conclude that the essential elements of the defense are present. Specifically, to merit a duress instruction, a defendant bears the burden of producing some evidence from which the jury could conclude the following:
>
> > A) The threatening conduct was sufficient to create in the mind of a reasonable person the fear of death or serious bodily harm;
> >
> > B) The conduct in fact caused such fear of death or serious bodily harm in the mind of the defendant;

C) The fear or duress was operating upon the mind of the defendant at the time of the alleged act; and

D) The defendant committed the act to avoid the threatened harm.

A threat of future injury is not sufficient; rather, the threatening conduct or act of compulsion must be present, imminent, and impending. Moreover, the threat must have arisen without the negligence or fault of the person who insists upon it as a defense. [*Henderson*, 306 Mich App at 4-5 (quotation marks, citations, and omission omitted), quoting *People v Lemons*, 454 Mich 234, 245-247; 562 NW2d 447 (1997).]

Here, a duress defense was not supported by the evidence presented at trial. See *Dobek*, 274 Mich App at 82. In the trial court and on appeal, defendant asserted that Gibbs', Porter's, and Brown's testimony that defendant repeatedly yelled, "They're trying to rob me," while wearing a t-shirt with spots of blood on it, provided some evidence from which the jury could conclude that the elements of a duress defense were fulfilled in this case. However, Gibbs, Porter, and Brown observed no other people other than themselves in the vicinity during the incident, and they observed nothing that appeared to be a robbery.

The evidence admitted at trial provides no basis for concluding that threatening conduct, "sufficient to create in the mind of a reasonable person the fear of death or serious bodily harm," occurred in this case. *Henderson*, 306 Mich App at 4-5, quoting *Lemons*, 454 Mich at 247. Likewise, the evidence admitted at trial provides no basis for concluding that defendant was actually afraid of death or serious bodily harm when he committed the carjacking. See *id*. Because defendant failed to present some evidence from which the jury could conclude that he committed the offenses in light of a reasonable fear of death or serious bodily harm, see *id*. at 4, the trial court's denial of defendant's request for a duress instruction was not outside the range of principled outcomes. See *Gillis*, 474 Mich at 113.

## VII. CONCLUSION

Defendant has failed to establish that any of his claims on appeal concerning his convictions warrant relief.

Affirmed.

/s/ Michael J. Riordan
/s/ Henry William Saad
/s/ Michael J. Kelly

-16-